[Civ. No. 4641. Third Appellate District.—November 21, 1932.]

LILLY GAMBREL, Respondent, v. L. E. DUENSING, Appellant.

Clark, Nichols & Eltse for Appellant.

Sheridan Downey and Orrin J. Lowell for Respondent.

PLUMMER, J.—The plaintiff had judgment in this action against the defendant for the sum of $15,000, for and on account of personal injuries alleged to have been received in an automobile accident which occurred on the eighth day of January, 1931, and further alleged as having resulted from the negligence of the defendant. From the judgment entered after the denial of the motion for a new trial, the defendant appeals.

The record shows that on the eighth day of January, 1931, the plaintiff in this action, accompanied by her son, Louis Gambrel, was driving in a southerly direction on the state highway extending northerly from the town of Roseville, at the same time the defendant was driving northerly on the same highway. Prior to the accident the defendant was driving her automobile northerly on the right-hand side of the paved portion of the highway, and the automobile in which the plaintiff was riding was being driven southerly,

and at the time of the impact, almost entirely off the westerly portion of the paved highway, being the right-hand side of the highway on which the automobile in which the plaintiff was riding was being propelled.

The record shows that when the defendant was some two or two and one-half times the distance of an ordinary city block from the point of collision she observed two men on horseback ahead of her near where the collision took place. The horses were on the right-hand side of the highway when first observed, one being on the easterly edge of the highway, the other entirely off the paved portion. As she approached the horses she decreased her speed to about twelve or fifteen miles an hour; that when she was a short distance from the horses the rider of one of the horses looked backward and reined the horse to the right. At this instant the horse slipped and fell, a portion of the body of the horse striking upon the paved portion of the highway; that at this same time, in order to avoid a collision with the horse and the rider, the defendant turned her automobile to the left, and in so doing, crossed the paved portion of the highway and collided with the automobile in which the plaintiff was riding, which was traveling in a southerly direction. The collision took place about opposite the horses, or just a trifle after the defendant's automobile had passed them.

On the part of the plaintiff testimony was introduced to the effect that the driver of the automobile in which the plaintiff was riding, noticing that the defendant was losing control of her automobile, turned off the paved portion of the highway, and that in so doing sufficient space was given between the horses and the automobile in which the plaintiff was riding for the defendant to pass by with safety. The plaintiff's testimony also was to the effect that just prior to the collision the defendant's automobile was moving at the rate of about forty-five miles per hour, and that the automobile in which the plaintiff was riding was traveling at about thirty-five miles per hour. There is also testimony in the record to the effect that the speed of neither automobile was slackened prior to the collision.

Upon this appeal the appellant urges absence of negligence on the part of the defendant, contributory negligence on the part of Louis Gambrell, agency, and joint venture on the part of Louis Gambrel and the plaintiff, errors in instruc-

tions on the subject of release, and absence of evidence to support the damages awarded.

Section 113 of the California Vehicle Act requires: "Every person driving a vehicle on the public highways of this State shall drive the same at a careful and prudent speed, not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway, and no person shall drive any vehicle upon a public highway at such a speed as to endanger the life, limb or property of any person."

In considering the question of negligence it is necessary to bear in mind that the obstruction which led to the collision in this case, or according to the testimony of the record, upon which the jury was entitled to act, was on the side of the highway being used and occupied by the defendant. That under such circumstances it was necessary that the defendant should have her automobile under such control as to enable her to prevent injury to person or property.

■ Every person propelling an automobile upon the highway must take into consideration all the hazards attendant upon approaching animals, and we think especially when approaching from the rear, and must reduce the speed of the motor vehicle so as to be able instantly to avoid injury on account of any sudden or unexpected movement of the animal toward which the automobile is being driven. We also think it is clear that this rule applies more strictly to one approaching from the rear where the animals are on the side of the one approaching, than as against one who is approaching facing the animals where the animals are not on his side of the highway. ■ And also the fact must be taken into consideration that where the animal can see the object approaching, it is not so likely to place itself in front of the approaching automobile, or to be startled by it, as when the noise made by the automobile is only heard approaching from the rear. These we think are proper questions to be considered by a jury in determining whether an automobile driver is or is not complying with the requirements of section 113 of the California Vehicle Act.

■ The record also presents the further question that there is testimony to the effect that there was a clear passage afforded between the automobile in which the plaintiff was riding and the horses just referred to, which, had the de-

fendant reduced the speed of her car so as to have proper control thereof, she might have passed the horses without injury to anyone. If, by reason of not having reduced her speed sufficiently to have her automobile under the required control, the defendant became confused, and as testified by one of the witnesses, lost control of her car and was unable to propel the same along the clear passage afforded by the automobile in which the plaintiff was riding being driven off the highway, then and in that case the question of the defendant's negligence was established, and her responsibility for all attendant injuries fixed.

In support of appellant's contention that turning her automobile to the left was not negligence, attention is called to the case of *Uhl* v. *Fertig,* 56 Cal. App. 718 [206 Pac. 467], and 3 Cal. Jur. 841. The text in 3 California Jurisprudence, *supra,* is to the effect that "one suddenly confronted with an unexpected danger may use such means for avoiding it as would appeal to a person of ordinary prudence in a like situation, without being held to strict accountability as to whether the course chosen is the most judicious or not. And the fact that he errs in judgment, miscalculates the space in which he may move, or momentarily forgets and encounters another danger, does not necessarily warrant the conclusion of contributory negligence, because, afterward, it may appear that he might have avoided both perils by choosing a different course. While it is often true that in cases of sudden circumstances of danger a person does the very act that he ought not to do to save himself from being injured, yet where the party causing those circumstances acted negligently and the injured person did not himself intentionally or from culpable carelessness contribute thereto, the latter will not be held responsible for any injury he may sustain merely because he did not act prudently or with good judgment in an effort to escape injury."

In the case of *Uhl* v. *Fertig, supra,* the defendants swerved to the left in order to avoid a collision with an automobile coming on to the highway from the defendants' right. While not so stated in the opinion, the inference to be drawn from the circumstances is to the effect that if the defendant had not swerved to the left, the plaintiff, by accelerating the speed of his automobile, would have passed by the danger zone and there would have been no collision between the

plaintiff's automobile and the one being driven by the defendant. In that case, however, the sudden peril was presented by the plaintiff himself. Nor was there anything presented to the defendant a sufficient length of time before the collision to enable the defendant in that case to bring his automobile under such control as to prevent ''injury to person or property.''

■ While a person is not to be held to the strictest accountability, as shown by the text quoted from California Jurisprudence, *supra*, when suddenly confronted with imminent danger, if the circumstances are such as to present to a reasonable person apprehension that such sudden peril may be presented, as by the unexpected movement of an animal, and due precautions are not taken to enable one to avoid injury, we do not see how it can be argued that the rule of imminent or sudden danger affords any excuse. In other words, if one who fails to exercise ordinary precautions when approaching, or about to pass an animal, is suddenly confronted with additional peril by reason of the movement of that animal, and injury results therefrom, responsibility is not lifted from the shoulders of the one failing to exercise such reasonable precautions.

■ Instead of guiding her automobile through the vacant passageway between the horses and the automobile in which the plaintiff was riding the record shows that the defendant turned her car to the left across the highway at an angle of about forty-five degrees, and further, that her brakes had not been applied before the horse shied and went down on its haunches on the highway. These circumstances presented to the jury the question of whether or not the defendant, if she had exercised proper control of her automobile, could have passed between the horses and the automobile in which the plaintiff was riding without injury to anyone, and the finding of the jury upon such facts is conclusive upon appeal. While we might agree with the appellant that the driver of the automobile in which the plaintiff was riding should have slackened the speed of his car, yet the fact was presented to the jury that such driver went off the paved portion of the highway sufficiently far to admit of the defendant passing the horses safely. This fact gave the jury a right to conclude that the failure of the defendant to have her automobile under proper control, and

to propel it through the open passageway, was the proximate cause of the injury. By reason of what appears in the record, as just stated, it is unnecessary to consider the appellant's contention that the plaintiff and Louis Gambrel, the owner and driver of the automobile in which the plaintiff was riding, were engaged in a joint enterprise.

Appellant further contends that the plaintiff in this action is barred by reason of a certain instrument purporting to release the defendant and the State Farm Mutual Auto Insurance Company from liability, in consideration of $350, which was signed by the plaintiff. The record shows that on the second day after the accident, two representatives of the insurance company just named called upon the plaintiff, and also upon Louis Gambrel, and obtained their signatures to the instrument hereinafter considered, and delivered to Louis Gambrel a check drawn in his favor for the sum of $350. As against this contention the respondent relies upon section 1542 of the Civil Code, which reads: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of the execution of the release, which if known by him must have materially affected his settlement with the debtor"; and at the time of the release being executed the plaintiff did not know or appreciate the fact that the injury received in the collision upon which this action is based, existed. This injury is set forth in paragraph IV of the complaint as follows: "That as a result of said accident plaintiff received a blow upon her forehead which resulted in a haemotoma over the left eye; injury to both left and right eyes which has resulted in a total loss of vision in the left eye and a seventy-five per cent loss of vision in the right eye."

It is further contended that the release was signed when the plaintiff was not in a physical or mental condition to properly apprehend the effect of the instrument which was being signed by her, and that the obtaining of her signature under such circumstances constituted a fraud. The circumstances of signing the release are shown by the following excerpts from the testimony: "Q. Mrs. Gambrel, it has been plain here that you and Louis signed a release of all your right to claim damages for $350.00; do you remember signing some papers for men who came there

representing an insurance company? A. Yes, sir. Q. How many men came to see you? A. Two. Q. When did they come to see you? A. The second day after the accident. Q. What was your mental and physical condition at that time? A. I couldn't read at all; they read it. Q. How did you feel? A. I was just nervous and all to pieces; I didn't realize or know what they were reading about. Q. State to the jury whether or not you were suffering any pain? A. Pain in my head was still bandaged, my nose, I didn't know whether I was sitting or standing; they couldn't keep me in bed *I was so nervous.* Q. Was Louis in the same room with you? A. He was in bed, wasn't able to stand on his feet. Mr. Downey: At this time had you consulted with any lawyer about this case? A. No, sir. Q. Did you have any business man or other person there to advise you? A. No sir. Q. You state you did sign some paper? A. Yes, sir. Q. Was it read to you? A. Yes, they read it; I didn't pay much attention to it. Q. Did you understand what they read? A. No sir, I didn't; my head hurt too bad. Q. Did they tell you what kind of paper you were signing? A. A receipt. Q. Did they tell you how much? A. Yes, they left a check for $350.00. Q. To whom was it made payable? A. To my son. Q. Did they make statements to you why they made the check payable to your son? A. No, sir. Q. Didn't they tell you any reason they were giving him the check instead of you? A. No, never said a word about it. Q. Did they make statements to you as to what this $350. was to cover? A. It was to cover our expenses up until that time. . . . Louis Gambrel, direct examination: Q. Were you present, of course you were present, but you and your mother, the second day after this accident signed some kind of paper when a check for $350. was given to you? A. Yes. Q. What was your mental and physical condition at that time? A. It was so sudden right after the accident I was feeling pretty low; I was laying in the front room on the bed; pretty weak from loss of blood, my head was throbbing, I didn't care whether I died or not, to tell the truth, I didn't pay much attention to it; I didn't feel like reading it; I couldn't read it if I wanted to; they read it off to us. I took it as a receipt for the check they were going to leave; they hadn't made out the check yet. Q. It sounded to you

like a receipt the way they read it? A. Yes. Q. That is what you thought it was? A. Yes. Q. Was your mother close to you? A. Yes sir, both in the front room. Q. Were you lying on the bed? A. Yes. Q. Could you hear what your mother said and what they said? A. Yes. Q. Do you remember the names of the two men? A. No, sir. Q. What was your mother's physical and mental condition? A. She was pretty, in pretty serious condition; her head bandaged up, her eyes black from above her eyes to the lower cheek bones, it was bandaged across the bridge of her nose, a bump in the middle of her forehead. Q. Was she suffering pain? A. Yes. Q. Was she able to read this receipt? A. Yes, sir. Q. Did she read this receipt? A. No, sir. Q. Or the paper you signed there? A. No, sir. Q. Did these men make any statement to you as to what kind of paper it was you and your mother were signing? A. No, sir, they didn't; in fact, they just read it off; I didn't understand it; I took it as just they were leaving a receipt for the check of $350. they were leaving when they left. Q. You took it from what they said to you and what they read to you? A. Yes. Q. Did they tell you what the $350. was made up of, what it was to cover? A. Yes, to cover the damages of the car, the hospital bill in Roseville, and any private bills up to that time. Q. Did they make any statement about any subsequent injuries or damages? A. They said when they left the check if there was any other damages that they were willing to make another payment. Q. To whom was the check made that was left there? A. Made to me personally. Q. Did you cash that check? A. No, sir.''

That there was a mistake of the parties as to the extent of the injuries suffered by the plaintiff, and especially as to the injury upon which this action is specially predicated, unquestionably appears in this case. The damages which entered into the $350 as the basis of the settlement was apportioned as follows: $180 for damages to the automobile, and the remainder for hospital bills, doctors' fees, etc.

There is further testimony in the record to the effect that neither the plaintiff nor Louis Gambrel would have signed the release had they known of the resulting injury to the plaintiff's eyesight. The release signed by the plaintiff and Louis Gambrel is in the words and figures following, to wit:

"We, Mrs. Lilly Gambrel & Louis Gambrel, of the city of Yuba City, County of Sutter, State of Calif., for and in consideration of the sum of three hundred fifty dollars paid to us by State Farm Mutual Auto. Ins. Co., the receipt is hereby acknowledged, do hereby release and discharge C. E. & L. E. Duensing and State Farm Mutual Auto. Ins. Co. of the City of Bloomington, County of McClean, State of Ill. from any and all claims or demands of any nature whatsoever accruing prior to this date, and particularly from all claims and demands arising out of accident 99 highway 1½ miles north of Roseville, Calif. on or about the 8th day of Jan. 1931, in or near the city of Roseville, County of Placer, State of Calif."

Irrespective of the question of fraud, or of any undue influence, or whether the plaintiff was in a physical or mental condition to fully comprehend and appreciate the legal consequences of signing the paper which she thought was a release, the fact of mutual mistake is fully disclosed by the record. The plaintiff had no knowledge whatever at the time of signing the release that her eyesight had been impaired, or would become impaired by reason of any injury that she had suffered. If the representatives of the insurance company had any knowledge of such fact, then their concealment thereof amounted to a fraud. We do not need to cite authorities that a release can be set aside for a mistake of fact, as section 1542 of the Civil Code provides for such procedure.

The next contention of the appellant is that the court committed reversible error in its instructions to the jury. In making this contention the appellant complains of the mass of instructions handed to the trial court to be given to the jury. The record discloses that of the instructions read to the jury twenty-six were requested by the appellant and only fifteen by the plaintiffs; and further, that the instructions requested by the appellant are very much longer than those requested by the plaintiff. No further answer need be given to the somewhat intemperate language used by the appellant in referring to offered instructions.

The error insisted upon by the appellant in the giving of instructions is that some of them are broader than the issues covered by the testimony, to wit: After instructing the jury, at the request of the defendant, as fol-

lows: "The jury is instructed that the cause of action of plaintiff, Lilly Gambrel, is barred by reason of the release executed by her, unless you further find the following facts to be true: 1. You must find either that the release was procured from her by fraud; 2. Or at the time she executed the release she was a victim of an injury actually received in an accident, the existence of which was unknown to her" —the court, at the request of the plaintiff, gave the following instruction: "I instruct you that a party to a contract, and a release is a contract, may rescind the same if: the consent of the party rescinding or any party jointly contracting with him, was given by mistake or obtained through duress, menace, fraud or undue influence, exercised by or with the connivance of the party as to whom he rescinds or of any other party to the contract jointly interested with such party." This instruction, of course, includes more than mistake and fraud, but is in fact only a comprehensive statement of the provisions of the Civil Code setting forth the basis for rescission. There is nothing in the instruction indicating that there was any testimony in the case upon which the jury might find duress, menace, fraud, undue influence or mistake. The jury was thereafter instructed as to what constituted undue influence, and also to the effect that an assent to a contract obtained by fraud was not binding. The jury was instructed that it might take into consideration the mental and physical condition of the plaintiff at the time of the execution of the alleged release.

The instructions complained of go only to the release and not to the extent of the injury, and if the injury, as alleged by the plaintiff, and found by the jury, resulted in the loss of eyesight to the plaintiff, the defense of mistake in the execution of the release is so satisfactorily established that no prejudice can be said to have resulted to the defendant by reason of the court giving the instructions complained of, especially in view of the fact that the jury was specifically directed that they could only relieve the plaintiff from her signature to the release by reason of fraud or mistake. On either one of these grounds the record contains sufficient testimony to support the verdict of the jury.

In 2 California Jurisprudence, page 1026, the rule which we think applicable to this cause is thus stated: "A judgment will not be reversed because of the giving or refusing of instructions which do not harm the appellant. To justify a reversal, under the Constitution it must appear, from a consideration of all the evidence, that any error in this respect resulted in a miscarriage of justice. It is not necessary to invoke the remedial provisions of the Constitution to show that errors of the instructions are harmless where the verdict would be the same with correct instructions, etc. . . . The giving of an instruction upon an abstract proposition of law not entirely applicable to the case will not warrant a reversal where it is apparent that no injury resulted therefrom." See, also, *Marston* v. *Pickwick Stages,* 78 Cal. App. 526 [248 Pac. 930], and the cases cited in that opinion, which are so complete as not to need further consideration.

The contention that Louis Gambrel was a necessary party to this action does not appear to us to be tenable or to require any extended consideration.

■ It is finally contended that the damages are excessive, and that the testimony does not sustain the plaintiff's contention as to loss of her eyesight being attributable to the injury resulting from the collision. In this particular the record shows that there was a large swelling on the forehead of the plaintiff as a part of injuries suffered by her; that it was necessary to keep her eyes bandaged for a number of days; that prior to the collision her eyesight had been good; use of glasses had not been necessary; that from the time of the receipt of the injuries complained of attendant upon the collision the eyesight of the plaintiff has gradually deteriorated until there is practically a total loss of vision of the left eye, and only about twenty-five per cent efficiency of the right eye. Dr. Jones, a physician called by the plaintiff, testified that in his opinion the loss of sight was attributable to the injury. This opinion was based upon a hypothetical question stating the facts set forth in the record. While the appellant contends that the hypothetical question does not contain a true statement of the facts, it does appear that no objection was made thereto at the time of the trial.

■ It is also contended by the appellant that the facts testified to by the plaintiff are and were untrue. The jury,

however, were the sole judges whether the facts detailed by the witnesses were or were not true. Against the testimony of the plaintiff and Dr. Jones the defendant introduced two physicians who testified that in their opinion the loss of eyesight was attributable to other causes. Again, as to what should be the true deduction from the conflicting testimony was a problem for the jury and not for the court. The testimony does show that the plaintiff did a few days more work after the injury than she testified that she remembered. This again went only to the credibility of the witnesses, to be passed upon by the jury.

We do not need to cite authorities to the effect that $15,000 damages for the loss of one's eyesight is not excessive, and this is true even though one eye still retains twenty-five per cent of its normal efficiency. No reasonable person would give up the loss of eyesight in one eye, and the loss of seventy-five per cent of the efficiency of the remaining eye, for the amount of damages awarded in this case.

The judgment is affirmed.

Pullen, P. J., and Thompson (R. L.), J., concurred.