[Civ. No. 4924. Third Appellate District.—December 22, 1933.]

IRWIN E. HUDGINS, Appellant, v. STANDARD OIL COMPANY OF CALIFORNIA (a Corporation) et al., Respondents.

[Civ. No. 4925. Third Appellate District.—December 22, 1933.]

RUSSEL B. RENISON, Appellant, v. STANDARD OIL COMPANY OF CALIFORNIA (a Corporation) et al., Respondents.

[Civ. No. 4943. Third Appellate District.—December 22, 1933.]

IRWIN E. HUDGINS, Respondent, v. STANDARD OIL COMPANY OF CALIFORNIA (a Corporation) et al., Appellants.

[Civ. No. 4944. Third Appellate District.—December 22, 1933.]

RUSSEL B. RENISON, Respondent, v. STANDARD OIL COMPANY OF CALIFORNIA (a Corporation) et al., Appellants.

Frank A. Duryea for Plaintiffs and Appellants.

Rich, Weis & Carlin for Defendants and Appellants.

PLUMMER, J.—The above-entitled causes being actions for damages resulting from the same automobile collision were tried together before the same jury, are reported in one transcript, and presented to us upon one set of briefs. The jury returned a general verdict in favor of the plaintiff Hudgins, for the sum of $1,000, and in favor of the plaintiff Renison, for the sum of $500. The jury also returned three special verdicts. The court set aside the general verdicts on the alleged ground that the special verdicts or findings of the jury were inconsistent therewith, and entered a judg-

ment for the defendants. From this judgment the plaintiffs, respectively, appeal.

The general verdict in the Hudgins case is as follows: "We, the jury, find for the plaintiff, and assess his damages in the total sum of $1000.00."

In the Renison case the verdict was in similar language, save and except that only $500 was allowed as damages. The special verdicts of the jury consisted in answers to three questions: "Question 1: Did the plaintiff, on or about October 19, 1932, execute and deliver to the defendants, or for them in this case, the instrument dated October 19, 1931, a copy of which is set forth in defendants' answer? Answer: Yes. Question 2: Did the defendants, or any one acting for them, make any misrepresentations to plaintiffs as to the contents, character or legal effect of such instrument? A. No." The third question appearing in the transcript as No. 4 reads: "Did the defendants, or their representative, say anything to the plaintiff or do anything to prevent the plaintiff from becoming fully acquainted with the character, contents or legal effect of said instrument before the signing thereof by the plaintiff? A. No." These three questions were propounded in both cases and the answers were the same.

The complaint alleges in the Hudgins case, which is similar in all respects to the Renison case save as to damages set forth, the incorporation of the Standard Oil Company, the existence of a certain highway known as and called the "Tahoe-Ukiah Highway"; that the collision occurred on said highway at a point between three and four miles from the city of Marysville; that at the point of collision the highway was and is approximately 40 feet in width; the main traveled portion thereof was and is approximately 18 feet in width; that on the seventeenth day of October, 1931, near the hour of 6:30 P. M., while it was dark, the plaintiff was a passenger riding in a Ford touring car in a northeasterly direction along said highway, and at a point indicated, as herein stated, it came in contact with a Ford truck belonging to the Standard Oil Company, driven by its agent, Edward E. Chave; that the night was dark and that the Ford truck belonging to the defendant was being driven without any headlights. As a result of the collision it is alleged the plaintiff suffered personal injuries, and for

which it appears that the jury awarded him the sum of $1,000. In the same collision between the same automobiles the plaintiff Renison is alleged in his complaint to have suffered personal injuries, and for which he was awarded the sum of $500.

As a defense to the action the defendants pleaded contributory negligence, and also that the plaintiffs had executed releases in full. The release in the Renison case was based upon the payment of the sum of $15. The release in the Hudgins case, which is identical in language with the release in the Renison case, save as to the amount of money received, is as follows:

"RELEASE IN FULL

"RECEIVED OF STANDARD OIL CO. OF CALIFORNIA the sum of fifty-five and no/100 dollars (55.00)

"IN CONSIDERATION OF WHICH sum I hereby release and discharge Standard Oil Co. of California, and E. E. Chave, of and from any and all claims and demands which I now have, on account of, or arising out of an accident which occurred on or about the 17th day of Oct. 1931, three miles north of Marysville, California, resulting in personal injury.

"IT IS UNDERSTOOD AND AGREED that this release extends to all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected, and all rights under Section 1542 of the Civil Code of California are hereby expressly waived.

"IT IS FURTHER UNDERSTOOD AND AGREED that the payment of said sum is not, and is not to be construed as, an admission on the part of said payors of any liability whatsoever in consequence of said accident.

"Dated at Marysville, Calif., this 19th day of Oct. 1931.
"IRWIN E. HUDGINS (L. S.)"

In both cases the plaintiffs filed an affidavit denying the genuineness and due execution of the writing entitled "Release in full".

Upon the part of the plaintiffs it is insisted that the court erred in holding that the special verdicts or findings of the jury were inconsistent with the general verdicts. In addition to controverting this position taken by the plaintiff in each case, the defendants contend that the plaintiffs were

guilty of contributory negligence in that the Ford automobile in which they were riding was being driven without any headlights; that they were aware of this fact, and in connection with others who were riding in the automobile, agreed to go on to their destination after the headlights had gone out.

Whatever may be our views as to the merits of the respondents' contention that the plaintiffs were equally guilty of negligence with the driver of the Ford truck belonging to the respondent corporation, and whatever wrong said driver was committing, plaintiffs were likewise committing, we are precluded from considering this contention of the respondents by reason of the fact that respondents are not appellants and are not in a position to present the question of contributory negligence for our consideration. ▉ The correctness of the judgment of the trial court must be measured by what we are about to say, the authorities hereinafter cited, and whether the trial court was correct in its action in view of the limited powers granted by the sections of the Code of Civil Procedure hereinafter considered.

In *Rapp* v. *Southern Service Co.,* 116 Cal. App. 699 [4 Pac. (2d) 195], we find the following which we think is the law applicable to the instant case: "It is the general rule that a respondent in whose favor a judgment is rendered is interested only in maintaining the judgment, and that he cannot on an appeal of the opposite party ask a court of review to consider any errors against him. (2 Cal. Jur., p. 839.) This is true even though errors of which respondent complains were excepted to by him in the trial court and included in a bill of exceptions and are argued or discussed in respondent's brief. (2 Cal. Jur., p. 839; 3 Cor. Jur., p. 1404.) 'The party who prevailed at the trial has no errors, committed at the trial, to complain of, and if he had he would not be heard to complain, for he was not injured thereby.' (*Byxbee* v. *Dewey,* 128 Cal. 322, 324 [60 Pac. 847].) The following California decisions are authority for the above-stated rule: *Seaward* v. *Malotte,* 15 Cal. 305; *Klauber* v. *San Diego Street Car Co.,* 98 Cal. 105 [32 Pac. 876]; *Estate of Olmsted,* 122 Cal. 224 [54 Pac. 745]; *Coyle* v. *Lamb,* 123 Cal. 264 [55 Pac. 901]; *Globe Grain & Milling Co.* v. *Drenth,* 41 Cal. App. 604 [183 Pac. 285];

*Meeker* v. *Cross*, 59 Cal. App. 512 [211 Pac. 229], opinion on application for rehearing.''

■ Under our form of pleading, save and except as to written instruments set out in the answer, all statements of any new matter appearing therein are deemed controverted without any further pleading. This rule is well settled, as appears by the cases cited in 21 California Jurisprudence, page 164. Thus, a plaintiff without any further affirmative pleading may set up fraud, misrepresentation, mistake, rescission, statute of limitations, undue influence, etc.

This brings us to a consideration of the question: Are the special verdicts inconsistent with the general verdicts? ■ It is unnecessary to cite the cases holding that all intendments are in favor of the general verdicts, and that everything necessary to be found by the jury, not otherwise controverted, will be deemed found and included therein. It follows from this statement that if any material facts tendered by the issus and supported by testimony are not included within the special verdicts, such facts will be deemed to have been found in favor of the party in whose favor the general verdict is returned.

■ Reverting to the special interrogatories submitted to the jury, and their verdicts or findings thereon, it appears that only three questions were actually passed upon, to wit: 1st: That the plaintiffs executed the instrument and delivered the same as set forth; 2d: That the agents of the respondents did not make any misrepresentations to either plaintiff as to the contents, character, or legal effect of the release; and 3d: That no representative of the defendants did anything to prevent the respective plaintiffs from becoming fully acquainted with the character, contents or legal effect of the instruments before the signing thereof.

No interrogatory or question was presented to the jury as to whether the respective instruments were not executed through mistake, or through the mutual mistake of the parties thereto. Section 1689 of the Civil Code, provides for the setting aside of a contract or release under such circumstances. Subdivision 1 of that section reads: ''If the consent of the party rescinding, or of any party jointly contracting with him was given by mistake, or obtained through duress, menace, fraud or undue influence exercised by, or with the connivance of the party as to whom he

rescinds, or any other party. to the contract jointly interested with such party,'' rescission may be had. Likewise, section 1542 of the Civil Code is applicable in that it is worded as follows: ''A general release does not extend to claims which a creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with the debtor.'' ·

In order to render the special verdicts of the jury inconsistent with the general verdicts it would have been necessary to submit an interrogatory involving the subject of mistake, and there appearing no such interrogatory and no such special finding or verdict on the part of the jury, it must be presumed, in support of the general verdict, that the jury came to the conclusion that the release was executed through the mistake, and as appears by the testimony hereinafter to be cited, the mutual mistake of the parties thereto.

In 24 California Jurisprudence, page 910, the rule as to presumptions in favor of general verdicts is thus stated: ''All presumptions are in favor of a general verdict, and no presumption will be indulged in favor of answers to special interrogatories as against the general verdict. The language of a finding should not be strained to make out a case of conflict, but should if reasonably possible be so construed as to harmonize with the verdict. The findings will be considered as a whole, and obscurities and apparent inconsistencies should be given weight in favor of, rather than against, the general verdict. A special finding is held inconsistent with a general verdict only when, as a matter of law, the finding as taken by itself would authorize a judgment different from that permitted by the verdict.'' This rule is a little more emphatically stated in 27 Ruling Case Law, pages 880, 881, to wit: ''The special facts returned must be of such a nature as to exclude the possible existence of other controlling facts, provable under the issues, relating to the same subject. They must clearly exclude every conclusion that would harmonize with the general verdict, as it is only when the antagonism between the special findings and the general verdict on material questions is of such a nature as to be beyond the possibility of reconciliation under any supposable state of facts provable under the issues that the special findings control. Accordingly in the absence of evidence, and especially where only a part of the

facts is embraced in special findings of the jury, the special findings, so far as they will admit of it, will be given an interpretation consistent with the general verdict, and the general verdict will be deemed to be sufficiently supported by the evidence, and to include every element necessary to its validity not negatived by the special findings.''

It may very well be, and we are concluded by the special verdicts of the jury, that the plaintiffs in both cases executed the instruments and delivered them on the dates mentioned; that no one for the defendants made any misrepresentations, and that no one for the defendants did anything to prevent the respective plaintiffs from becoming fully acquainted with the character, contents or legal effect of the instruments set out in the respondents' answers, and yet if those instruments were executed under mistake, or by the mutual mistake of the parties thereto, the findings are not inconsistent with the general verdicts because a finding to that effect which is presumed to be included in the general verdicts would entitle the plaintiffs to have the verdicts stand as rendered, irrespective of the three questions answered in favor of the respondents.

An exactly similar situation is presented in the case of *Moore* v. *Copp,* 119 Cal. 429 [51 Pac. 630]. There, four questions were presented to the jury. Number one related to the mental incompetency of the plaintiff; number two, as to whether it was executed under undue influence; number three, through fraud; number four, by mistake. The first three questions were answered in the negative; the fourth, answered affirmatively. It was there held that the judgment should follow the affirmative answer as to the contract having been executed by mistake. This case illustrates the insufficiency of the three special verdicts or findings to affect the integrity of the general verdicts.

In *Tremble* v. *Tuman,* 175 Cal. 696 [167 Pac. 142], the rule is stated and followed that a general verdict for the plaintiff imports a finding in favor of the plaintiff of all the averments of the complaint material to his recovery.

To the same effect might be cited a number of cases, but the authorities referred to in 24 California Jurisprudence, *supra,* and 27 Ruling Case Law, *supra,* we deem sufficient.

In *Gambrel* v. *Duensing,* 127 Cal. App. 593 [16 Pac. (2d) 284], this court, considering the question of mistake, re-

ferred to the section of the code relating thereto, as follows: "We do not need to cite authorities that a release can be set aside for a mistake of fact, as section 1542 of the Civil Code provides for such procedure." In that case there was a mutual mistake as to the extent of the injuries suffered by the plaintiff, and the record shows that only certain items of damages entered therein.

That the extent of the injuries suffered by the respective plaintiffs was not considered at the time of the settlement and was not taken into consideration by either of the parties thereto, is shown not only by the testimony of the plaintiff in each case, but also by the testimony of the person who negotiated the release on the part of the respondents.

Paul Mackie, called as a witness on the part of the defendant, and the one who conducted the negotiations, testified as follows: "Tell the jury what you said to Mr. Renison, and what he said to you or what anybody else said in the presence of Mr. Renison? A. I believe the first thing we did was to take his statement as to how the accident occurred. I took that down in writing on one of our tablets which he signed. We then discussed settlement and he said he wanted his doctor's bills paid, realizing that both cars were to blame, but he was poor and that was all he was looking for, and we called Dr. Abbott in Marysville and from him obtained the number of treatments which he estimated would have to be taken. I believe he said five or three dollars a treatment, making a total of fifteen dollars. That amount was agreed to by Renison and I made out a release for that amount, which he signed, and were witnessed by both the Standard Oil men."

In relation to the Hudgins case, the same witness further testified as follows: "The money question was brought up. He said he wanted his doctor's bills paid, and loss of wages. I had phoned to Dr. Duncan, and from him I got the nature and extent of the injuries to Mr. Hudgins, and also got the approximate amount of the doctor's bill. Q. Did you talk that over with Mr. Hudgins? A. Yes, sir. Q. How much did you arrive at? A. $25.00 for the doctor bill, and figured to go to Mr. Duncan—figured he would be disabled for 2 weeks. He said he made $2.50 a day, and we figured on that basis he would have made $30.00 for loss of wages, plus the $25.00 doctor bill, making a total of $55.00."

Mr. Renison's testimony as to the same question is as follows: "I went up to the Standard Oil Company. Q. What was the conversation? A. I just asked him if he thought that he hadn't ought to pay the doctor bill. It was a Standard Oil truck that ran into us, and this chiropractor wanted his money." · The witness testified that when he went to the Standard Oil Company he met Mr. Mackie and Mr. Monijhan and Mr. Gardner. "Q. Did you tell Mr. Gardner what the chiropractor told you about your injuries? A. Yes, sir. Q. What did you tell him? A. I told Mr. Gardner that the chiropractor said it would take 5 or 6 treatments to fix my back, and he said, 'I think the Standard Oil Company will more than be glad to pay your doctor bill,' and I told him that was all right. I said, 'I haven't any money,' and I felt that I ought not to pay the doctor bill, and they should pay me for laying off, and when I told him that, he didn't say whether they would pay for laying off or not. Q. Did you at that time know how long it would take to restore you under the treatment of the chiropractor? A. No, sir. Q. Did you know at that time that you had injuries which you found out afterwards you had? A. No, sir."

Plaintiff Hudgins testified: "That he signed the release by his initials; that he was not able to read it at that time; that he was in such misery and pain at the time that he could not sit up; that at the first meeting with Mr. Mackie and Mr. Monijhan no conversation was had about doctor bills; that upon the second interview, on the same day Mackie said he was willing to pay all the doctor bills, and they would do what was right, and he told me the doctor's bills would be $25.00, and I told him I didn't feel like settling that way. He said it would be just a matter of a few days until I would be up and go to work; he said about two weeks; he said the doctor told him that; I didn't talk to the doctor myself; I told him then I thought I ought to have wages for two weeks' work; that I would be laid up; he asked me how much I was getting, and told him 25c an hour, or $15.00 a week, and he said he would add $30.00 for that, and he went in another room and wrote that up, marked out the $25.00, and came back with it reading $55.00; I then signed it; nothing further was said about any compensation or damages, than what I have said."

Our attention has not been called to any conflicting testimony to what is here set forth. We do not need to detail the injuries suffered by the respective plaintiffs, but the excerpt from the testimony of Dr. Duncan will show that the extent thereof was never considered. This doctor testified as follows: "I had occasion to treat Irwin Hudgins on or about October 17, 1931, first at my office and then he was sent to the County Hospital. He had a fractured nose and a fractured upper jaw bone, which extended back into the roof of the mouth, and some minor sprains of his finger and hand. I afterward sent him to Dr. Kline, a dentist. The principal treatment was done by the dentist. I don't know whether he has entirely recovered from the effect of that or not; I have not examined him. I never put in any charges; I treated him as a county patient; I did not know at the time he was a private patient, and never made any charge. Fifty dollars would be a fair charge as a private patient." The dentist stated that $50 would be a fair charge for his services. Dr. Hoffman testified that the injury to the nose would remain unless he was further operated upon.

It may here be stated that the collision between the two automobiles occurred on the evening of October 17, 1931, and that the releases were signed on October 19, 1931, the second day thereafter. Dr. Hoffman testified that he treated the plaintiff Renison between six and eight weeks, and that his bill therefor amounted to $112; that Renison had many other injuries and fracture of the second rib.

Somewhat similar questions were involved in the cases of *Davis* v. *Diamond Carriage & Livery Co.*, 146 Cal. 59 [79 Pac. 596], and *Mellus* v. *Potter*, 91 Cal. App. 700 [267 Pac. 563], where the record showed that only certain items of the damages were considered at the time of the signing of the releases.

This testimony shows that the jury may very well have considered and found that the releases were executed and signed by, through, and on account of the mutual mistake of the parties. That a mutual mistake of facts justifies the rescission of a release from liability for personal injuries appears in the well-considered case of *St. Louis-San Francisco Ry. Co.* v. *Cauthen*, 112 Okl. 256 [241 Pac. 188, 48 A. L. R. 1447]. This case is so replete with citations that we

can only refer to the volume of the Pacific Reporter, where the opinion is set forth in full. That such a finding must be presumed to have entered into the general verdict appears from the authorities which we have cited, and therefore that the court was in error in concluding that the special findings or verdicts of the jury contravened and were inconsistent with the general verdict.

The record shows that no motion was made for a directed verdict, and, therefore, the respondents are not in a position to urge that such procedure was correct under the provisions of section 629 of the Code of Civil Procedure. A reference to that section demonstrates that no basis was laid for the entry of judgment in favor of the respondents, by reason of what the court should have done but did not do. The first paragraph of that section reads: "When a motion for a directed verdict, which should have been granted, has been denied, and a verdict rendered against the moving party, the court, at any time before the entry of judgment, either of its own motion or on motion of the agreed party, shall render judgment in favor of the agreed party, notwithstanding the verdict."

Had the judgments been entered upon the general verdicts in favor of the plaintiffs, then the respondents, upon motion for new trial, could have presented to the court the issue that the plaintiffs were guilty of contributory negligence as a matter of law, but that was not done. Likewise, if the judgments had been entered in favor of the plaintiffs, then upon appeal to this court the respondents could have urged that the record establishes the plaintiffs guilty of contributory negligence as a matter of law.

The motion that may have been made in the trial court does not appear in the transcript, but as there does appear a recital in the judgments that the court entered the same pursuant to its construction of the special findings, in accordance with the request of counsel for the respondents, the conclusion is unavoidable that the whole proceeding was based upon section 625 of the Code of Civil Procedure, which section contains the following sentence: "Where a special finding of facts is inconsistent with the general verdict, the former controls the latter and the court must give judgment accordingly."

As we have said, there being no motion for a directed verdict, the court had no power to set aside the general verdict and enter judgment in favor of the respondents upon any other section of the code than section 625, *supra,* which action we have held to be erroneous. It follows, therefore, that we have no recourse but to set aside the judgments entered upon the special findings, and to direct the trial court to enter judgment in each case in favor of the respective plaintiff therein, based upon the general verdict returned by the jury in favor of such plaintiff. And it is so ordered.

■ With reference to the respondents' appeals in actions Nos. 4943 and 4944, from the orders of the trial court denying their motions to terminate the proceedings to settle the transcript in the foregoing causes, and the appellants' motions to dismiss such appeals on the ground that no appeal lies from an order refusing to settle the transcript, while it would appear, following the reasoning found in the case of *McWilliams* v. *Hudson,* 98 Cal. App. 185 [276 Pac. 598, 277 Pac. 529], that no appeal lies from such an order, and that the action of the court on such a proceeding may be considered on an appeal from the judgment, it is not necessary for us to decide this question, as an examination of the transcript presented to us on such appeals leads to the conclusion that the trial court did not abuse the discretion allowable to be exercised by it.

In the case of *O'Banion* v. *California Canning Peach Growers,* 109 Cal. 328 [292 Pac. 975], this court has decided that such orders will not be interfered with unless an abuse of discretion is shown. Therefore, the orders of the court are affirmed.

Pullen, P. J., and Thompson, J., concurred.