[L. A. No. 17700. In Bank.—February 17, 1941.]

J. W. BACKUS, Respondent, v. MILTON SESSIONS et al., Appellants.

Wright, Monroe, Harden & Thomas and Monroe & McInnis for Appellants.

Joseph S. Campbell for Respondent.

CARTER, J.—Defendants appeal from a judgment rendered by the court sitting without a jury awarding plaintiff $3,500 damages for injury to the optic nerve of his left eye, and progressive impairment of vision and blindness resulting therefrom. That injury and other injuries resulted from a collision on April 5, 1939, in the day time between plaintiff's motorcycle and defendant Sessions' delivery truck, being driven by Sessions' employee, defendant Bonnin. The collision occurred in the city of San Diego at the intersection of India and Redwood Streets, each of which is paved and curbed and 52 feet wide. By reason of the obstruction of the view of traffic within the statutory distance on Redwood Street to northbound traffic on India Street, the *prima facie* speed limit at the intersection was 15 miles per hour. (California Vehicle Code, sec. 511.) Under these circumstances

plaintiff drove south on India Street and made a "U" turn about three-fourths of a block south of the intersection. He then drove north on India Street. Defendant Bonnin was driving south on India Street, and at a point about 16 feet north of the north line of the intersection with Redwood Street commenced to make a left turn into Redwood Street and in so doing crossed to his left of the center line of India Street, "cut the corner", and proceeded across the northeast quarter portion of the intersection. Just prior to the collision both plaintiff and Bonnin were traveling 25 miles per hour. The collision was head-on and occurred 3 feet south of the north line and 16 feet west of the east line of the intersection. As a result of the collision plaintiff suffered mental and physical shock, a fractured left ankle and wrist, bruised back and arm, and cuts and bruises on the left side of his head and on the left eye; the optic nerve of his left eye was injured resulting in partial atrophy and 80 per cent loss of vision and the prognostication is total blindness in that eye. The damages were found to be $3,500 for the injury to the optic nerve and the results flowing therefrom, and $800 for all other damages.

Defendants denied that Bonnin was negligent and pleaded as special defenses a release from plaintiff and contributory negligence. From the foregoing facts it is obvious that the finding of the trial court that defendant Bonnin was negligent and that his negligence was the proximate cause of the collision is supported by the evidence.

Defendants contend that the release was a complete defense to the action. After the accident, plaintiff, being a member of the United States Marine Corps, was taken to the United States Naval Hospital in an unconscious condition. He was totally unconscious until 9 o'clock that night. While at the hospital he was under the care of Dr. Grindell, a physician attached to the hospital. The following day, April 6, 1939, at about 3 o'clock in the afternoon, A. B. Severance, an insurance company adjuster from defendant's public liability carrier, called on plaintiff at the hospital. Severance was accompanied by Dr. Findley, who also came on behalf of the insurance carrier. At that time, according to Severance's testimony, there was a conversation with plaintiff with reference to plaintiff's injuries and the settlement thereof. Dr. Grindell was present and Dr. Findley examined plain-

tiff. The conversation between Severance and plaintiff related to the settlement of the case. Plaintiff wanted a new motorcycle and $1,000 and was hesitant about settlement until he knew the extent of his injuries. The upshot was that plaintiff executed a general release of all damages suffered, both personal and property, for the sum of $800; the release provided among other things, that section 1542 of the Civil Code was waived. A draft for $800 was given to plaintiff; he was told about the draft being held for him the following day but had no recollection of it. On the face of the draft appeared the following:

"In full satisfaction, compromise and discharge of all claims against Milton P. Sessions and Edwin Bonnin for damages as result of auto accident at India Street and Redwood Street, San Diego, San Diego County, California." The draft also provided that the sum was ordered paid to plaintiff in full satisfaction of the above-mentioned damages. On the reverse side of the draft was the following:

"In full payment and complete satisfaction of all claims against Milton P. Sessions and Edwin Bonnin under policy Number 8130402 for damages as result of accident occurring 4/5/39 at Redwood and India Streets, San Diego County, San Diego, California.

"The Endorsement must be made in conformity with the claim or claims as written on the face of the draft.

"In consideration of such payment of said —— Milton P. Sessions and Edwin Bonnin is hereby discharged from all further claim by reason of said settlement, leaving —— Dollars $ . . . only in force under this policy.

Signed "JOE WRIGHT BACKUS."

■ The court found that at the time the release was executed and the draft delivered on April 6, 1939, and for several hours thereafter, plaintiff was in a dazed and semiconscious condition and was without capacity to contract and was unaware of his rights and injuries; and further that he had no knowledge of the contents of the release until presented to him at the trial of the case. There is ample evidence to support those findings and, although there is a conflict in the evidence, under the familiar rule that an appellate court will not disturb a finding of the trial court where the evidence is conflicting, that finding cannot be here questioned. (*Hartman Ranch Co.* v. *Associated Oil Co.*, 10 Cal.

(2d) 232 [73 Pac. (2d) 1163].) Plaintiff testified he had very little memory about what took place on the afternoon of April 6, 1939, that he did not remember signing any release or being examined by Dr. Findley. The evidence shows that less than 24 hours before the signing of the release and the conversation on April 6, 1939, he had suffered a fractured wrist and ankle, bruised arm and back, and injuries on the face, head and left eye and concussion. His left eye and left side of his face were bandaged. He did not recognize friends who called at the hospital. To them he was in a dazed condition. Opiates had been administered to him the night before. We believe that this and other evidence was adequate to support the finding that plaintiff was not competent when the release was executed; and due to his physical and mental condition was not aware of what transpired on the afternoon of April 6, 1939. It must be concluded therefore that the release was void.

However, defendants claim that regardless of what plaintiff's condition may have been when the release was executed and the draft delivered, the subsequent cashing of the draft by plaintiff and his endorsement with the releases stated thereon, on April 17, 1939, was a ratification of the release of April 6, 1939, or was a complete release in itself. It is not disputed that when plaintiff endorsed and cashed the draft he was fully competent and knew what he was doing. The theory of the trial court on this proposition clearly appears from its findings. It found:

"and (insurance carrier) having such knowledge, and concealing the same from plaintiff, who first discovered the fact in June, 1939, left at the hospital on April 6, 1939, a draft for Eight Hundred Dollars ($800.00) for plaintiff, which was in release of all claims for injuries on account of the accident. Plaintiff cashed this draft on April 17th, 1939, by endorsement. At that time plaintiff was in full possession of his mental faculties and was aware of and intended to release all of his damages then known to him which were in fact all except as for the injuries to his optic nerve of the left eye, which was then not known to him, and of which he remained in ignorance until after he had spent all of the $800.00."

The court then proceeded to determine that the damages for all of the injuries, except the injury to the optic nerve, was $800, the sum plaintiff had received on the draft. Under

these circumstances it is clear that it was the court's conclusion that plaintiff was not bound by the release arising from the endorsement and cashing of the draft because he did not then know of the injury to his optic nerve and therefore the case came within the provisions of section 1542 of the Civil Code.

Defendants state in their brief that neither plaintiff nor defendants knew of the character of the injury to plaintiff's eye. They state:

" . . . it is entirely unreasonable and improper to conclude that when Dr. Findley, who was not an eye specialist, made the superficial examination on the day after the accident, he was charged with any accurate knowledge of the injury. The *unquestionable fact is that no one knew at the time* whether the injury was permanent or otherwise."

The trial court found that defendants did know of the injury to plaintiff's optic nerve and of the permanent impairment of vision, at the time he (Dr. Findley) examined plaintiff on April 6, 1939, and that having such knowledge defendants were fraudulent in concealing it from plaintiff. Be that as it may, it is not material whether or not they had such knowledge. Conceding that neither defendants nor plaintiff knew of the injury to the optic nerve at any time until after the draft was cashed, the trial court's conclusion that plaintiff was not bound by the release or cashing of the draft was proper. Section 1542 provides:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

Assuming that the release, and draft and endorsement and cashing thereof may be considered all one transaction, it does not follow that the cashing of the draft was a ratification of the release in all its phases. This is true for the reason that there cannot be said to be a ratification or confirmation of a void instrument or agreement when the person alleged to have made the ratification did not know what the agreement contained or all the facts when the alleged confirmation took place. (*International M. Co.* v. *National R. Co.,* 67 Cal. App. 498 [227 Pac. 918]; *Schmidt* v. *Mesmer,* 116 Cal. 267, 271 [48 Pac. 54].) Plaintiff knew nothing of the release or what it contained until after the

draft was cashed; he knew nothing of it until it was exhibited to him at the trial. It is true he knew the draft contained release provisions and that by cashing it he was making a settlement but nothing was said in the release provision of the draft about known or unknown injuries or waiving section 1542 of the Civil Code as appeared in the release. Under such circumstances it is not material whether the cashing of the draft with the release thereon be considered as a ratification of the release or as an independent instrument constituting a release and settlement. The essence of the problem is therefore, whether the case comes within the terms of section 1542 of the Civil Code, providing that a release does not include claims for injuries not known or suspected to exist by the releasor when executed. Plaintiff could not know of the injury to his optic nerve when he signed the release because at that time he was not mentally competent and was not aware of what was transpiring. ██ The lower court found that plaintiff did not know of the injury to his optic nerve and the impairment of vision and ultimate blindness which would result therefrom, when he endorsed and cashed the draft. Defendants urge that that finding is not supported by the evidence in that the most that plaintiff can be said to have been ignorant of was that the impairment of his vision would grow progressively greater to the final tragedy of blindness.

In this connection plaintiff testified that he had injuries on the left side of his face and around the left temple and eye; seven stitches were taken, some being in the eyebrow. His eye and the side of his forehead were bandaged for about two weeks. He did not know of his optic nerve being injured and that he would probably lose the sight of his eye until he consulted an eye specialist while still at the hospital, about June 17, 1939, two months after he had cashed the draft. He stated that he had difficulty with his eye since the injury, but what difficulty does not appear. It may have been because of the cuts and bruises alone. Defendants would have the court consider evidence of the conversation between Severance, Dr. Findley and plaintiff on April 6, 1939, as bearing on plaintiff's knowledge that his vision was permanently impaired (and other matters), but the trial court has found on substantial evidence, that plaintiff's condition was such that he was not mentally accountable for

what transpired at that time; thus, such evidence should not be considered by us. It follows then that the evidence justifies the trial court's finding that plaintiff did not know of the injury to his optic nerve and of the permanent impairment of his vision when he endorsed and cashed the draft. The case is simply one then where a person, when he signs a release for all injuries, has suffered cuts and bruises around the eye and other injuries of which he knows, but he is also suffering from an injury to the optic nerve which will result in a permanent impairment of vision and ultimate blindness of which he does not know. Under these circumstances section 1542 is applicable. It is not a situation where unexpected and unknown consequences develop from a known injury. The impairment of vision and ultimate blindness are not consequences flowing from the bruising of the eye and the cuts thereabout, rather they are from the unknown injury to the optic nerve. *O'Meara* v. *Haiden,* 204 Cal. 354 [268 Pac. 334, 60 A. L. R. 1381], is controlling here. There the action was for wrongful death of a minor, occurring seven months after the accident, caused by an injury to the spleen. The defense was a release of all known and unknown damages given prior to the minor's death. It appeared that there was a bruise over the abdomen causing a hemorrhage in the spleen not visible to the naked eye; the *bruise on the abdomen however was observed and known.* This court held the release did not cover the damages for the death resulting from the injury to the spleen, stating at page 360:

"It appears, therefore, beyond question, that at the date of the release the injury which was the cause of the boy's death was not known to either party. It was not in the minds of the parties at the time of the settlement which resulted in the execution of this written release. Accordingly, although the release may purport upon its face to extend to the plaintiff's claim for damages arising from the death of his son, yet in reality it does not do so (sec. 1542, Civ. Code). It is unreasonable to suppose that plaintiff would have entered into said agreement of settlement whereby he released the defendant of all damage for the sum of $250 had he known that there was any possibility that the boy had received this fatal injury to his spleen. Such knowledge would have materially affected his settlement with defendant. To hold him to the terms of the release would not only be manifestly

unfair and unjust, but it would be against the law of this state as we understand the same and as we have attempted to state it in the foregoing pages of this opinion.''

In *Gambrel* v. *Duensing*, 127 Cal. App. 593 [16 Pac. (2d) 284], a general release for personal injuries was signed by plaintiffs when they were not aware of what they were doing and were under the impression that the $350 received therefor was. for property damage and hospital expenses rather than the personal injuries. The court said at page 601, et seq.:

''It is further contended that the release was signed when the plaintiff was not in a physical or mental condition to properly apprehend the effect of the instrument which was being signed by her, and that the obtaining of her signature under such circumstances constituted a fraud. . . .

''That there was a mistake of the parties as to the extent of the injuries suffered by the plaintiff, and especially as to the injury upon which this section is specially predicated, unquestionably appears in this case. The damages which entered into the $350 as the basis of the settlement was apportioned as follows: $180 for damages to the automobile, and the remainder for hospital bills, doctors' fees, etc.

''There is further testimony in the record to the effect that neither the plaintiff nor Louis Gambrel would have signed the release had they known of the resulting injury to the plaintiff's eyesight. The release signed by the plaintiff and Louis Gambrel is in the words and figures following, to wit:

'' 'We, Mrs. Lilly Gambrel & Louis Gambrel, of the city of Yuba City, County of Sutter, State of Calif., for and in consideration of the sum of three hundred fifty dollars paid to us by State Farm Mutual Auto. Ins. Co., the receipt is hereby acknowledged, do hereby release and discharge C. E. & L. E. Duensing and State Farm Mutual Auto. Ins. Co. of the City of Bloomington, County of McClean, State of Ill. from any and all claims or demands of any nature whatsoever accruing prior to this date, and particularly from all claims and demands arising out of accident 99 highway 1½ miles north of Roseville, Calif. on or about the 8th day of Jan. 1931, in or near the city of Roseville, County of Placer, State of Calif.' .

''Irrespective of the question of fraud, or of any undue influence, or whether the plaintiff was in a physical or mental condition to fully comprehend and appreciate the legal con-

sequences of signing the paper which she thought was a release, the fact of mutual mistake is fully disclosed by the record. The plaintiff had no knowledge whatever at the time of signing the release that her eyesight had been impaired, or would become impaired by reason of any injury that she had suffered. If the representatives of the insurance company had any knowledge of such fact, then their concealment thereof amounted to a fraud. We do not need to cite authorities that a release can be set aside for a mistake of fact, as section 1542 of the Civil Code provides for such procedure." (See, also, *Hudgins* v. *Standard Oil Co.*, 136 Cal. App. 44 [28 Pac. (2d) 433]; *Wetzstein* v. *Thomasson*, 34 Cal. App. (2d) 554 [93 Pac. (2d) 1028]; *Touhy* v. *Owl Drug Co.*, 6 Cal. App. (2d) 64 [44 Pac. (2d) 405].)

██ Defendants next urge that there was no proper tender of the $800 paid on the draft when plaintiff sought to rescind the release, and that such an offer of restoration was vital to plaintiff's case. By letter to defendants from plaintiff's attorney on May 12, 1939, notice of rescission was given together with a statement of an offer to restore the $800. In reply to that letter the insurance carrier replied that they were going to investigate the matter and would advise of their decision later.

The court found that at the time of the written offer to restore, "plaintiff had assets convertible to cash in the amount of $200.00 and could have borrowed $600.00 to have completed restoration of $800.00, but did not have the sum of $800.00 in cash to restore if defendants had surrendered their claims under said writings of April 6, 1939". That finding is supported by the evidence. Section 2074 of the Code of Civil Procedure provides that an offer in writing to pay a sum of money if not accepted, is equivalent to actual production and tender of the money and section 2076 provides that a person to whom a tender is made must specify any objection he has to it or it is waived. It is true that those sections do not affect sections 1493 and 1495 of the Civil Code which require an offer to be made in good faith and that the offeror must be willing and able to perform according to the offer. (*Allen* v. *Chatfield*, 172 Cal. 60 [156 Pac. 47].) But we cannot say that when plaintiff had assets convertible in cash of the value of $200 and had sufficient credit and was able and willing to borrow $600, he was unable or unwilling to

restore the $800 to defendants. It is quite evident that the offer of rescission and to restore was not accepted by defendants. Apparently plaintiff heard nothing further from them after the offer was made; and after he commenced his action defendants claimed in their answer that the release was in full force and effect and a complete bar to plaintiff's action. In any event rescission and an offer of restoration are not necessary under circumstances such as are here existent. The original release made on April 6, 1939, was absolutely void and no rescission was necessary. There was clearly no meeting of the minds because plaintiff was incompetent at that time. The release contained in the draft considered either as a separate release instrument or as a ratification of only the general release provisions of the original release required no rescission or offer to restore for the simple reason that there was nothing to restore. The release, in the language of section 1542, *did not extend to unknown injuries,* that is, the injury to the optic nerve. Putting the matter affirmatively it did extend to *all injuries* except that to the optic nerve, and therefore the $800 was the settlement figure agreed upon for all other injuries and being such there would be no occasion for restoring it to defendants. They had received for that sum a release for all of such other injuries and they are not in any way prejudiced. The injuries to the optic nerve being unknown were simply not a part of the release contract, or stated another way, no release was made with reference to the optic nerve. It is not dissimilar to a release which specifies on its face that it covers only part of the injuries suffered. In either case the release stands as the agreement of the parties as to the known injuries. Realizing this the trial court found, as heretofore shown, that the $800, the amount of the draft, was the amount of damages suffered by plaintiff by reason of all injuries, except the optic nerve. This reasoning finds support in *Meyer* v. *Haas,* 126 Cal. 560 [58 Pac. 1042], where it was held that the release extended only to the loss of time item of damages, and the court said, at page 563:

"The contract under such circumstances will be held to be what the maker of it intended it should be, and not what it was made to appear to be by the deception practiced. The twenty-five dollars paid plaintiff may, therefore, properly be said *to have been received in payment for the loss of time*

*during his illness, and not in satisfaction of anything that his mind never consented that it should satisfy.* The claim sued upon does not include this loss of time, and the court instructed the jury that they could find nothing against defendants for loss of time. *No offer to return the money was necessary, for the reason that the plaintiff in this case 'is not attempting to avoid a contract which he has made, but is showing that he did not make the contract which he apparently made.'* (*Mullen* v. *Old Colony R. R.,* 127 Mass. 86; 34 Am. Rep. 349; *Chicago etc. Ry. Co.* v. *Lewis,* 109 Ill. 120; *Senter* v. *Senter,* 70 Cal. 619 [11 Pac. 782]; *Wilson* v. *Moriarty,* 77 Cal. 596 [20 Pac. 134]; 88 Cal. 207 [26 Pac. 85]; *Sullivan* v. *Moorhead,* 99 Cal. 157 [33 Pac. 796].)''

It is said in *Wetzstein* v. *Thomasson,* 34 Cal. App. (2d) 554, 560 [93 Pac. (2d) 1028]:

''The objection has also been raised by defendant that in order for plaintiff to maintain this action she should have offered to restore to defendant the sum paid at the time of signing the releases. No offer to restore the consideration received is necessary where a party is tricked or deceived into signing a contract different in its terms and objects from the contract which she has made and which she understands that she is executing. No offer to return the money was necessary because *plaintiff is not seeking to avoid a contract made by her but is merely showing that she did not make the contract which was apparently made* by her. (*Meyer* v. *Haas, supra; Tyner* v. *Axt, supra.*) Plaintiff understood that the release covered only doctor bills incurred to date and the cost of obtaining a helper in the flower shop for thirty days. The judgment covered only such items of damage as have accrued since the date of the settlement. The rule is well stated in *Garcia* v. *California Truck Co., supra*: 'In other words, if the situation is such that reforming the release to make it read as it would have read except for the fraud upon the plaintiff, the release would still purport to be a bar to the plaintiff's cause of action, then in order to maintain his action he must rescind and avoid the release, and for rescission an offer of restoration is necessary.' '' (See, also, *O'Meara* v. *Haiden, supra.*)

It follows then that because of the ignorance of the existence of the injury to the optic nerve, the payment of the $800 necessarily covered all damages except those flowing

from such injury, and the trial court found plaintiff's damages for injury to the optic nerve was $3,500 and that "for all other damages are the sum of Eight hundred Dollars ($800.00).", and also that "the draft for $800.00 was a full release and satisfaction of all plaintiff's damages known at the time it was negotiated by plaintiff, and these include all damages except injury to optic nerve of his left eye and progressive loss of vision thereof." Under these circumstances defendants are not in a position to object to the sufficiency of any offer of rescission or restoration.

Finally defendants complain that the finding against contributory negligence is insufficient and that the evidence establishes contributory negligence as a matter of law. From the foregoing discussion of the facts it is apparent that there was adequate evidence from which the trial court could find a lack of negligence on the part of plaintiff contributing proximately to the collision. The mere fact of the speed at which plaintiff was traveling, 25 miles per hour, was not necessarily a proximate cause of the accident. It is true that due to the view being obstructed the *prima facie* speed limit was 15 miles per hour, but that limit has reference to traffic entering into India Street from Redwood Street rather than traffic turning left from India Street into Redwood Street as was done by defendant Bonnin. The obstruction of view did not affect the parties involved in the collision here involved. The trial court found:

"After defendant Bonnin turned left into the east half of India Street neither operator could have avoided the collision. Plaintiff had no knowledge of defendant Bonnin's intention to turn in front of plaintiff until defendant Bonnin had begun his left turn. Plaintiff's negligence was not *a* proximate cause of the collision and was *remote.* Defendant Bonnin's negligence was *the* proximate cause of the collision." Although more precise findings could have been prepared, we believe that such finding was sufficient to negative the defense of contributory negligence. In *Frazzini* v. *Cable,* 114 Cal. App. 444, 455 [300 Pac. 121], it is said:

"However, finding No. 15, as follows, 'That it is not true that the death of Renardo Frazzini occurred proximately and directly through and by reason of the unlawful and wrongful act of said plaintiff in any manner at all,' read in connection with finding No. 3, which fixes the negligence of the

appellant as the proximate cause of the death of Renardo Frazzini is sufficient to constitute a finding negativing contributory negligence, even considering the pleading sufficient to raise the issue of contributory negligence." (See, also, *Squier* v. *Davis Standard Bread Co.*, 181 Cal. 533 [185 Pac. 391]; *Miner* v. *Dabney-Johnson Oil Corporation*, 219 Cal. 580 [28 Pac. (2d) 23]; *Katz* v. *T. I. Butler Co.*, 81 Cal. App. 747 [254 Pac. 679].)

The judgment is affirmed.

Shenk, J., Curtis, J., Traynor, J., Edmonds, J., and Gibson, C. J., concurred.

A petition for a rehearing was denied March 17, 1941.