## UNITED STATES v. JOHNSON.
### No. 12238.

United States Court of Appeals
Ninth Circuit.
April 7, 1950.

578

Frank J. Hennessy, U. S. Attorney, Rudolph Scholz, Asst. U. S. Attorney, San Francisco, Cal., for appellant.

Sheridan Downey, Jr., Oakland, Cal., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

On December 22, 1949, Johnson, a citizen and resident of Contra Costa County, California, a civilian employee of the Navy upon the Island of Guam, was injured by the overturning of a vehicle in which he was riding. At the time vehicle was being driven by one Moore, a Navy chief pharmacist's mate. Johnson brought this action under the Federal Tort Claims Act, 28 U. S.C.A. § 1346(b).[1] He recovered judgment, and the United States, upon this appeal, as-

serts error in the court's finding (1), that Moore, the driver, was acting "in line of duty", and (2), that the injury resulted from carelessness and negligence for which the United States was responsible.

The facts relating to Moore's duties and employment and the circumstances surrounding the accident which caused the injuries were not developed with much detail in the trial court. The following statements were all admitted for the record:

1. "On December 22, 1946 one John F. Moore was an enlisted man, to-wit, a Chief Pharmacist's Mate in the United States Navy, and was stationed on the Island of Guam, attached to Fifth Service Depot, on duty at Eighth Ammunition Company."

2. "On the afternoon of December 22, 1946 John F. Moore was required by his duties to proceed to the Dispensary at the Fifth Service Depot to turn in his daily report. Before doing so he met the plaintiff, Elmer R. Johnson, and asked plaintiff if he would like to come with him. He told the plaintiff that he would take plaintiff to plaintiff's quarters at the Navy Air Base, Agana, and the plaintiff agreed to accompany Mr. Moore."

3. "After the conversation referred to in Statement No. 2 plaintiff Elmer R. Johnson and John F. Moore went into the Club rooms at the Ground Ammunition Depot where they met Seaman 1st Cl. Raymond J. Beaulieu, Seaman 1st Cl. Homer L. Taylor, and Seaman 2nd Cl. William L. Barger. All engaged in conversation and several of the group consumed some beer."

4. "During the conversation referred to in Statement No. 3, mention was made of the fact that plaintiff was a barber and the sailors asked plaintiff if he would cut their hair. Plaintiff said that he would if they would come to his quarters at the Naval Air Base."

5. "Plaintiff and the seamen asked John F. Moore if he would take them to plain-

---

1. The Act provides for recovery against the United States on account of "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employ-

ment, under circumstances where the United States, if a private person, would be liable * * * in accordance with the law of the place where the act or omission occurred."

tiff's quarters so that plaintiff might cut the seamen's hair. Mr. Moore agreed to do so."

6. "Thereafter, on said December 22, 1946, plaintiff John F. Moore and the three seamen referred to in Statement No. 3 proceeded in a reconverted ambulance belonging to the United States, with Moore driving the same, from the Ground Ammunition Depot to plaintiff's quarters at the Naval Air Base, where they alighted from the vehicle and the plaintiff took the seamen to his quarters and cut their hair. Thereafter they all ate dinner." (The admission as to this sixth statement was subject to the correction that the parties mentioned did not eat dinner at the place where the hair was cut.)

7. "After eating dinner at the Naval Air Base, the seamen asked John F. Moore to take them back to their quarters at the Ground Ammunition Depot, which he agreed to do."

8. "While enroute to the Ground Ammunition Depot, Seaman 1st Cl. Homer L. Taylor asked John F. Moore to drive to the Island Command Brig in order that Taylor might collect some money from one of the sentries at the Brig. Moore then drove the vehicle, in which plaintiff and the three seamen were riding, to the Brig for this purpose."

9. "After stopping at the Island Command Brig, Moore and the others proceeded on their way to the Ground Ammunition Depot. Enroute the vehicle in which they were riding overturned."

10. "At the time the vehicle overturned, John F. Moore had not yet turned in his daily report at the Fifth Service Depot Dispensary."

It appears from the facts thus admitted and from other testimony, that Johnson was employed as a painter but was also a barber and supplemented his income by cutting hair and doing other barber work at a barber shop at the Navy Air Base where Johnson lived in Navy barracks. About a mile and a half from Johnson's quarters was the town of Agana. About the same distance from Johnson's quarters in the opposite direction was the Fifth Service Depot at which was located the Navy Dispensary. Moore, a Chief Pharmacist's Mate, was attached to the Fifth Service Depot and had duties to perform at the Dispensary.

The only evidence of what Moore was required to do on the date in question is furnished by the agreed statement, quoted above. This indicates that it was then his duty and a part of his course of employment to deliver his report to the Dispensary. For reasons hereafter noted it is proper to infer that in doing this he was authorized to drive the vehicle.

The agreed statement and the testimony of Johnson indicate that Moore went on a number of other errands before he got around to take his report to the Dispensary. Moore first offered to take Johnson to Johnson's quarters at the Air Base; they then met the sailors, had some beer, and arranged to go to Johnson's quarters so that he could cut the sailors' hair, and Moore took the parties there in the reconverted ambulance. Johnson testified that after the hair cutting, which took from two to three hours, the entire party were driven by Moore to Agana where they ate dinner. Moore then stated that he would have to proceed to turn in his reports and the parties started back toward the Ground Ammunition Depot and the Dispensary, intending to pass Johnson's quarters on the way. The evidence shows that on this trip Moore's purpose was to stop along the way at the guardhouse to permit one of the men to collect some money owed him by one of the guards, to drop Johnson at his quarters at the Air Base, to return the other sailors to the Ground Ammunition Depot, and to turn in his report.

As Moore then drove in the direction of the Dispensary he first stopped at the guardhouse and then drove onward in the same direction. It was at this point that the car started "shimmying". The vehicle had started down a long hill and when the front wheels began to shake the accident occurred and the car turned over with the result that Johnson was hurt.

There is no evidence whatever as to what caused the car to overturn. Johnson testified: "The car began to shimmy and

shake the front wheels, and the accident occurred right then and there. I can't remember." It was stipulated that if Moore were present he would testify: "We had not gone very far when the truck started to slide. I tried to keep control, but could not. I do not remember what happened after that."

Johnson asserts that the facts bring the case within the rule of *res ipsa loquitur*. For the United States it is contended that insofar as the application of that doctrine may be predicated upon the operation of the vehicle being in the exclusive control of the defendant,[2] the facts here negative that exclusive control for, it is said, it is shown that the driver was not then acting in the scope or course of his employment, but had for the time departed upon a frolic of his own.

For the purpose of determining whether the facts here required a finding such as thus urged by the United States we must inquire as to what was the law of Guam upon this subject. After the Island had been acquired by the United States under the terms of the treaty following the Spanish-American war, the President, on December 23, 1898, issued a proclamation placing the Island under the control of the Navy and directing the Secretary of Navy to take such steps as might be necessary to give it the necessary protection and government. By an executive order of the Naval Government of Guam, on December 28, 1933, codes of laws were promulgated for the Island. These included a civil code. The civil code thus adopted was copied from the Civil Code of California. It has since been in effect, except as its operation was suspended during the Japanese occupation of the Island during the late war. Its reestablishment was proclaimed by Admiral Nimitz as Military Governor on July 21, 1944, after the re-occupation of the Island by the Navy.

The rule of *respondeat superior* was made a part of the law of Guam by section 2338 of the Code of Guam thus promulgated. It is the same as section 2338 of the California Civil Code, and reads as follows: "§ 2338. Principal's responsibility for agent's negligence or omission. Unless required by or under the authority of law to employ that particular agent, a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, and for his willful omission to fulfill the obligations of the principal." We have found no decisions of any Guam court dealing with this section, or the rule which it purports to state.

When the appropriate authority adopted from California a code of laws designed to replace the original part-Spanish law, it might be inferred that such codified rules as that of *respondeat superior* were intended to have the same significance and scope as they had been given by the Supreme Court of the State from which the code was taken.[3] In any event, the California decisions with respect to the tests for determining when the servant of a

---

2. Blashfield, Cyclopedia of Automobile Law and Practice, Sec. 6043: "When both the apparatus and the operation of it are in the exclusive control of the defendant, and the accident is one which ordinarily could not happen except by reason of defects in the apparatus or negligence in its operation, a presumption of one or the other arises from the happening of the accident."

3. Navy records indicate that some of the records of the adoption of the Guam code were destroyed during the war. They disclose that the codes were compiled and codified by Captain Stephan B. Robinson, Attorney General of Guam, at the time. In response to an inquiry by the Senate Committee on Interior and Insular Affairs, Captain Robinson, under date of September 20, 1948, gave an account of the adoption of the codes, in which he stated as one of the reasons for copying the California code: "(d) In the cases where the laws were alike, the use of the same form and organization gave the judges and attorneys the benefit of California Code Annotations and Law Digests and a reference to interpretations by other courts. This was a benefit to which great importance was attached for there were no digests of local laws and decisions and but a meager law library available."

private employer is acting within the course of his employment furnish a convenient starting point for a discussion of the first issue raised by the appeal. Two such decisions of the Supreme Court of California, both antedating the adoption of the Guam Code, will serve to illustrate our views of the principles properly applicable to the facts of this case.

The first of those cases is Waack v. Maxwell Hardware Co., 210 Cal. 636, 292 P. 966. There the defendant's truck driver, charged with the duty of taking the truck to a garage for repairs, instead of doing so, took the truck on an errand for his own purpose and did some hauling for his brother-in-law. This entailed a trip of some four miles, from a club, past the garage, to the brother-in-law's home. The driver then started for the garage, which was 1.1 miles distant, with the intention of having the repair work done. On the way, and with the garage still .1 mile away, an accident occurred out of which the action arose. The court held the question whether at the time and place of the accident the driver had resumed his employment in his master's business was a question of fact for the jury.

■ The second case is Ryan v. Farrell, 208 Cal. 200, 204, 280 P. 945, 946, which stated: "It is the established rule in this jurisdiction that where the servant is combining his own business with that of his master, or attending to both at substantially the same time, no nice inquiry will be made as to which business the servant was actually engaged in when a third person was injured; but the master will be held responsible, unless it clearly appears that the servant could not have been directly or indirectly serving his master."

■ The fragmentary record here contains no direct evidence as to the circumstances under which the motor vehicle was entrusted to Moore, or the use he was permitted to make of it. But since it appears that the vehicle belonged to the government, and that Moore was in the government's employ, the inference is permissible that Moore was authorized to drive the vehicle in performing his duty of delivering his report. In Montgomery v. Hutchins, 9 Cir., 118 F.2d 661, at page 665, this court was undertaking to apply the California rule and there said: "Where, as here, evidence is admitted showing that a third person is operating the automobile, that the automobile belongs to the defendant, and that the third person is in the employ of the defendant, then the jury may, but is not compelled to, make the inference that the third person was acting within the scope of his employment."

■ If we accept the theory of the United States that Moore's various errands having to do with obtaining hair-cuts and meals for his companions, and with stopping for the purpose of collecting a bill, were such that he was on a frolic of his own, that he had not merely deviated from his employment but had made a complete departure, we cannot thereby hold the court's judgment wrong. For even if we assume that such departure had occurred, yet we think that the trial judge, as trier of the facts, was justified under the rule stated in Waack v. Maxwell Hardware Co., supra, in finding that at the time when the accident occurred Moore had resumed his employment. The rule of that case has been followed in California, Cain v. Marquez, 31 Cal.App.2d 430, 440, 88 P.2d 200, 206, and it finds respectable support elsewhere. See Oliphant v. Town of Lake Providence, 193 La. 675, 192 So. 95, and cases cited. The Restatement of the Law of Agency, Sec. 237, states a somewhat more strict rule, to the effect that after a departure by a servant, he must have returned to a point "reasonably near the authorized space",[4] before he re-enters the employment.

But we cannot say that this rule of the Restatement was not satisfied here. The court might well have concluded on this

4. "A servant who has temporarily departed from the scope of employment does not re-enter it until he is again reasonably near the authorized space and time limits and is acting with the intention of serving his master's business."

record that when the accident occurred Moore was proceeding in a place, and on a road, where he was authorized and expected to be.

We do not undertake to say that the California cases we have cited are as authoritative as they might be had they turned upon a construction of the language of the code section afterward copied in the Guam code. We consider that unnecessary, for we believe the rules expounded in the authorities to which we have referred are so universally accepted, that we may apply them here in holding, as we do, that the court below was fully warranted · by the evidence in finding that the driver was acting in the scope of his employment at the time of the injuries to Johnson.

 It is next asserted that there was no evidence of negligence. We consider the argument without merit, for it appears to us that the case is clearly one within the doctrine of *res ipsa loquitur*. The facts fit those standards which generally define the rule and which are stated by Mr. Wigmore as follows: "(1) The apparatus must be such that in the ordinary instance no injurious operation is to be expected unless from a careless construction, inspection, or user; (2) Both inspection and user must have been at the time of the injury in the control of the party charged; (3) The injurious occurrence or condition must have happened irrespective of any voluntary action at the time by the party injured. It may be added that the particular force and justice of the rule, regarded as a presumption throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person." (Wigmore on Evidence, Third Ed., Sec. 2509.)

If what we have previously said is correct, then the court was justified in finding that the driver of the vehicle was within the scope of his employment at the time of the accident. It was a Navy vehicle, and it is

therefore inferable that inspection and maintenance of the car, as well as its operation, was in the control of the United States. A vehicle does not ordinarily capsize in this manner unless there has been negligence in inspection, maintenance or operation. No voluntary action on Johnson's part contributed to the injuries.

It follows that there was sufficient evidence to support a finding of negligence. Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468; Seney v. Pickwick Stages Northern Division, 82 Cal.App. 226, 255 P. 279.[5]

We find no error in any of the respects claimed by the appellant, and the judgment is affirmed.

---

5. For a discussion of the California cases on the doctrine of res ipsa loquitur, see Carpenter, "The Doctrine of Res Ipsa Loquitur in California", 10 Southern California Law Review, 166.