[Civ. No. 52402. Second Dist., Div. Three. Apr. 25, 1979.]

MYRTLE H. DuBOIS, Plaintiff and Appellant, v.
CAROLE L. SPARROW et al., Defendants and Respondents.

COUNSEL

Paul C. Rasmussen for Plaintiff and Appellant.

Pickell & Brown and Michael R. Kaiser for Defendants and Respondents.

OPINION

**POTTER, Acting P. J.**—Myrtle H. DuBois appeals from a judgment in favor of defendants Carole L. Sparrow and Grant S. Sparrow after the defendants' motion for nonsuit was granted. The complaint sought damages for personal injuries arising out of an intersection collision

between plaintiff's vehicle and a vehicle driven by defendant Carole Sparrow. General damages of $50,000 were alleged.

In a second cause of action, plaintiff sought to rescind a release in favor of the Sparrows covering "all liability resulting because of the accident," allegedly executed by her on May 10, 1971, in order to receive the sum of $2,240 "for the purpose of paying and discharging her medical, hospital and doctor bills incurred to that date and to acquire a new automobile." In her complaint, plaintiff admitted signing the document (which was a printed form filled in partly on a typewriter and partly in handwriting) but alleged that at the time of signature it "was blank as to all typewritten or handwritten provisions thereof other than the signature of Myrtle H. DuBois and the date after her name, '5-10-71'."

A bifurcated jury trial was held on the issue of the validity of the release. Plaintiff presented testimony of herself and of her son concerning the circumstances of execution of the release. Before the nonsuit was granted, testimony of Robert Evans, the adjuster for Safeco who obtained the release, was also heard on the limited issue of whether the release document offered by defendants was a photocopy of an original which had been lost.

As indicated by the testimony of all three witnesses, plaintiff was the insured under a policy with defendant Safeco which covered all property damage and medical expense sustained by her as a result of the accident. Plaintiff had extended dealings with Evans; they arose out of the fact that she reported the accident to her agent who arranged for Evans to contact her. According to plaintiff, she and Evans initially "discussed the benefits that were due to her under the accident" and Evans stated "that they [would] take care of the medical bills and they would repair or replace her car for her." At this time Evans had not disclosed that Safeco also carried the Sparrows' liability insurance.[1]

Plaintiff received drafts prior to the date of the release as follows: (1) March 25, 1971, for $1,047.21 for repairs to her 1971 Datsun; (2) April 7, 1971, for $245.51 for medical expense; (3) April 12, 1971, for $169 for loss of wages; and (4) April 23, 1971, for $130 for loss of wages. Each of these drafts showed that it was "[i]n settlement of" the specified medical or automotive repair expense or the loss of wages for the period specified.

---

[1]According to plaintiff, it was during the third or fourth visit to receive drafts for current medical bills and car repairs when Evans first mentioned that Safeco was insurer for the Sparrows.

As a result of these dealings, plaintiff was under the impression that Evans was "helping" her "trying to get over this claim." In this connection, plaintiff placed trust in Evans and thought, "I couldn't ask for a better person."

Evans testified that he initially called plaintiff to come down to his office; he did not recall whether or not on that occasion he knew that Safeco insured both parties. However, he was under the impression that he did "start off the claim on her [plaintiff's] own policy," saying in this respect, "I did open the file for Mrs. Dubois; so I—I think I probably tried to claim for her."

On May 10, 1971, plaintiff sought reimbursement for additional medical expense, loss of wages through May 9, taxi and rental car charges, and the sum of $450 to enable her to exchange automobiles.[2] On May 10, plaintiff had not gone back to work; she had not completed treatments for her injuries and the items for which she sought reimbursement were out-of-pocket losses of the same nature as those covered by the prior drafts. Plaintiff specifically denied that there was any discussion of payment on account of any other element of damage or "any negotiations with Mr. Evans or anyone else in the Safeco Insurance Company for a full release of [her] claim."[3]

Nonetheless, when shown the photocopy of the release dated May 10, 1971, which released the Sparrows "from all liability resulting from the accident" and asked whether the purported signature thereon was hers, plaintiff responded, "That is my signature there, yes." When shown this photocopy, plaintiff's son also affirmed that it was his mother's signature. Despite this admission, however, both witnesses denied that exhibit A was the document that plaintiff signed on May 10, 1971.

When plaintiff's attention was called to the handwritten "Yes" on the release answering the question, "Have you carefully read the foregoing release and do you know the contents thereof, and have you signed the same as your own free act?" plaintiff reiterated, "I didn't sign it," and denied that the "Yes" was in her handwriting.[4] In any event, plaintiff categorically denied that she had read the document before affixing her

_____

[2]Although $1,047.21 had already been disbursed for repair of her car, plaintiff found it did not operate satisfactorily and was advised that for her own safety she should exchange it for another Datsun one year older, which the dealer had agreed to do for $450.

[3]On cross-examination, plaintiff qualified this categorical assertion by stating: "I don't remember anything of it if there was. I don't remember it."

[4]On cross-examination, it was developed that in her deposition plaintiff had said it did not look like her writing and that she had no memory of writing something like that.

signature, explaining in this connection that it "wasn't in existence to read."

The testimony of Evans was equally unequivocal to the effect that plaintiff did fill in the "Yes" indicating that she had read the document and that the document when signed by her was in exactly the same form as it appeared in the photocopy.

The argument on the motion for nonsuit revolved principally around the question how, in view of plaintiff's admission that the signature on the Xerox copy was her signature, she could deny that she had signed the document. Counsel for plaintiff argued that the reconciliation of these apparently conflicting statements was simply that "that document was not signed as that document on May 10, 1971," and the signature on a document she did sign somehow was transferred to the exhibit, that there are "very many ways in which a person can put a signature on a document. You can Xerox them and put them on. You can trace them. You can copy them. There are a great many ways in which your signature can be put on."

██ ■█ Counsel for defendant argued to the contrary (1) that a stipulation permitting receipt into evidence of the Xerox copy of the purported release established its authenticity and, therefore, foreclosed inquiry into that matter,[5] and (2) that the admission that the signature on the copy was her signature established that she signed the original.

The court denied the motion for nonsuit when it was made at the close of plaintiff's case, and Evans' testimony was heard. Evans testified that the original, of which exhibit A was a copy, had been signed by plaintiff in his presence and that the word "Yes" had been filled in in her handwriting in the time between his handing it to her and her returning

---

[5]The argument that this stipulation foreclosed inquiry into the authenticity of the document is not advanced by defendants on appeal, and it is without merit. The only record of any stipulation is that which appears in the reporter's transcript where counsel for plaintiff (Mr. Rasmussen) stated: "Your Honor, counsel for the insurance company and I have indicated or stipulated that the purported agreement is to be entered into evidence as Defendants' Exhibit A."

Evans was present and prepared to testify that plaintiff had signed the original of which exhibit A was a photocopy and plaintiff wished to avoid Evans' testimony being put on out of order. Under the circumstances, the stipulation did not establish the authenticity of the release; it was merely a stipulation that there was "evidence sufficient to sustain a finding of the existence of the preliminary fact" of authenticity pursuant to Evidence Code section 403, subdivision (a)(3). This, of course, left the question of authenticity to be determined by the jury pursuant to subdivision (c)(1) of said section.

it. Defendants then renewed the motion. After considerable argument, the court indicated that as a result of Evans' testimony, defendants had "authenticated the copy as being a true copy of the original," and that no evidence had been presented of a "non-negligent mistake of fact by the plaintiff in signing that document." The nonsuit was granted.

### Issue

The issue presented by this appeal is as stated by our Supreme Court in *Casey* v. *Proctor* (1963) 59 Cal.2d 97, 100 [28 Cal.Rptr. 307], as follows: "The question presented is whether the record discloses substantial evidence that would support a holding that the release does not conclusively bar the action. (*Raber* v. *Tumin*, 36 Cal.2d 654, 656 [226 P.2d 574].) If so, then the judgment must be reversed and the issue presented to the jury. (See *Mairo* v. *Yellow Cab Co.*, 208 Cal. 350 [281 P. 66].)"

### Discussion

*Summary*

There was substantial evidence from which the jury could have found that exhibit A was not authenticated as an agreement between plaintiff and defendants. Plaintiff's testimony that she did not sign any document having such terms was not rendered nugatory by her admission that the "signature" on the copy was her signature. Likewise, Evans' testimony simply contradicted plaintiff's testimony that she had not signed the release and created an issue of fact.

In any event, if the release was authentic, there was substantial evidence that plaintiff was under a misapprehension as to its scope, which was induced by defendants' overreaching. Consequently, we conclude that the nonsuit was improperly granted and reverse the judgment.

*There Was Substantial Evidence Questioning the Authenticity of the Release*

The fact that Evans' testimony was clearly sufficient to sustain a finding of existence of the preliminary fact of authenticity of exhibit A so as to make it admissible in evidence did not deprive plaintiff of the right to a jury trial. Evidence Code section 403, subdivision (c)(1),[6] specifically

---

[6]This section provides:

"(c) If the court admits the proffered evidence under this section, the court:

"(1) May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist."

preserves plaintiff's right to have a jury determine the authenticity and to disregard this evidence if it finds against authenticity. Both plaintiff and her son testified positively that she did not sign any such document. The fact that when shown the Xerox copy of the document purportedly bearing her signature and asked if it was her signature, both of them answered affirmatively, is not irreconcilable with their prior denials. The document as shown to both witnesses clearly was a photocopy, both as to printed and typewritten text and purported signatures. The answer that it was plaintiff's signature could therefore only be an answer that it was a copy of plaintiff's signature and does not necessarily mean that the whole document was a copy of an original release executed by plaintiff. Plaintiff's denial that she signed any such document precludes interpreting her answer concerning the signature as an admission that there was an original release signed by her of which the exhibit was a copy.

Plaintiff had no very satisfactory explanation of how a copy of her signature appeared on defendants' exhibit A, but there is no physical impossibility of such signature appearing thereon without her having signed the original. It was, therefore, up to the jury as trier of fact to weigh the testimony of plaintiff and of her son against that of Evans and to determine the authenticity of the document.

*There Was Substantial Evidence That*
*Plaintiff Was Under a Misapprehension*
*Induced by Defendants' Misconduct*

Even if plaintiff did sign a release in the form of exhibit A on May 10, 1971, she is not necessarily foreclosed from contending that such release does not conclusively bar her. Her testimony was in effect that she believed that what she signed on May 10, 1971, was simply a further acknowledgment of receipt of additional medical expense, car expense, and wage loss on the same basis that such expenses had been reimbursed to her in the past. The previous drafts each contained a statement that it was "[i]n settlement of" specific items of such out-of-pocket expense. Plaintiff on May 10 had asked for further reimbursement in each of these categories in respect of cash outlays made by her since the April 23 draft. The items sought were no different in character than those for which she had been reimbursed without question by Safeco in four prior drafts totaling approximately $1,600. She thought she was simply acknowledging receipt of some more of the same.

Defendants, however, invoke the rule stated in *Casey* v. *Proctor*, *supra*, 59 Cal.2d at page 104, that a releaser who has no disability preventing him from reading the release is bound by its clear provisions. This rule, however, applies only in cases in which "there is no evidence of misconduct on the part of the releasee." (*Ibid.*) The rule is otherwise where there is any evidence that the releasee has not dealt fairly with the releaser. This was recognized by our Supreme Court in *Casey* when it said (*id.*, at p. 103): "It has often been held that if the releaser was under a misapprehension, not due to his own neglect, as to the nature or scope of the release, and if this misapprehension was induced by the misconduct of the releasee, then the release, regardless of how comprehensively worded, is binding only to the extent actually intended by the releaser. (*Raynale* v. *Yellow Cab Co., supra*, 115 Cal.App. 90 [fraud]; *Meyer* v. *Haas, supra*, 126 Cal. 560 [misrepresentation as to the contents of the release]; *Mairo* v. *Yellow Cab Co., supra*, 208 Cal. 350 [same]; *M. G. Chamberlain & Co.* v. *Simpson*, 173 Cal.App.2d 263, 276 [343 P.2d 438] [deception]; *Jordan* v. *Guerra, supra*, 23 Cal.2d 469 ['overreaching']; *Smith* v. *Occidental etc. Steamship Co., supra*, 99 Cal. 462 [same]; *Muir* v. *Cheney Bros.*, 64 Cal.App.2d 55, 60-61 [148 P.2d 138] [same]; *Wetzstein* v. *Thomasson, supra*, 34 Cal.App.2d 554 [same]; *Tyner* v. *Axt, supra*, 113 Cal.App. 408 [same].) Under such circumstances it is unnecessary to effect a rescission of the release, and no question of notice to rescind or of restoration of consideration received arises. (E.g., *Garcia* v. *California Truck Co.*, 183 Cal. 767, 770 [192 P. 708]; *Wetzstein* v. *Thomasson, supra*, at p. 560.) [Fn. omitted.]"

*Jordan* v. *Guerra* (1943) 23 Cal.2d 469 [144 P.2d 349], cited in *Casey*, more fully explains the standard for judging the effect of releases when misapprehension by the releaser is claimed. A jury verdict limiting a general release to specific items was affirmed. The court stated the principle as follows (*id.*, at pp. 475-477): "In any case it is for the trier of the facts to determine what the plaintiff understood was covered by the writing and whether his understanding different from the writing was induced by the defendant. If a misconception be found and that the defendant was responsible therefor, the contract insofar as it purports to release claims other than those understood by the plaintiff to be included, is ineffective to that extent, and rescission and tender as to the excluded items are unnecessary. The application of the rule of the Meyer case was recognized in *Garcia* v. *California Truck Co.*, 183 Cal. 767, 770 [192 P. 708]. (See, also, *Raynale* v. *Yellow Cab Co.*, 115 Cal. App. 90 [300 P. 991]; *Wetzstein* v. *Thomasson*, 34 Cal.App.2d 554 [93 P.2d 1028].) In the Raynale case the distinction was made between cases of contracts of

known content voidable because induced by fraud, and cases of no contract beyond the boundaries of mutual intent, citing the Meyer and other cases. In *Carr* v. *Sacramento Clay Products Co.,* 35 Cal.App. 439, 447 [179 P. 446], it was said: 'It is true that the law does not discourage settlements of controversies by agreement, and is disposed as far as possible to uphold them, but it is equally ready to relieve parties from fraud and imposition through which they have been induced to barter away their rights.' *It was held that in cases affording opportunity for overreaching,* 'the law demands good faith on the part of the releasee and a full understanding on the part of the person injured as to his legal rights.' (See, also, *Backus* v. *Sessions,* 17 Cal.2d 380 [110 P.2d 51]; *O'Meara* v. *Haiden,* 204 Cal. 354 [268 P. 334, 60 A.L.R. 1381]; *Rued* v. *Cooper,* 119 Cal. 463 [51 P. 704].)

"It is the province of the jury to determine whether the circumstances furnished the opportunity for overreaching, whether the defendant or his agent took advantage of it, and whether the plaintiff was thereby misled. In reviewing the case the evidence must be regarded in the light most favorable to the jury's conclusion. Regarded in that light it cannot be said that here there is no evidence of sufficient substantiality to support the verdict. The jury was justified in concluding that the adjuster sped to Dos Palos on the morning following the death of the child and on his arrival summoned the plaintiff from the funeral parlor in order to effect a settlement before the plaintiff could have an opportunity to secure independent advice. It was also justified in finding that the settlement purported to be covered by the language of the releases was inadequate; that Goodwin, in order to secure such a settlement for his employer, the insurance carrier, led the plaintiff into the belief that he was acting solely on behalf of Guerra, who could not act for himself because of his participation in the accident but desired to help out on the funeral expenses. (See Restatement: Restitution, sec. 8, p. 32 et seq.; California Annotations pp. 11-12.) The jury could also find that the subject of general liability was not discussed and that Goodwin's purpose in telling the plaintiff that Guerra had a right to be on his own premises was to mislead the plaintiff into believing that he had no claim except for the items of funeral expenses and time lost; and that those were the only items within the mutual understanding of the parties and covered by the releases.

"*In cases of this kind it has been said that the facts will be carefully scrutinized to discover whether the defendant has dealt fairly with the plaintiff.* In *Kansas City, M. & B. Ry. Co.* v. *Chiles,* 86 Miss. 361 [38 So.

498], quoted in *Wilson v. San Francisco-Oakland Terminal Railways*, 48 Cal.App. 343, 350 [191 P. 975], it was said: 'No release of this nature should be upheld if any element of fraud, deceit, oppression, or unconscionable advantage is connected with the transaction. And in passing on the validity of such release, when assailed, all surrounding conditions should be fully developed, and the relative attitudes of the contracting parties clearly shown. So that the jury, in the clear light of the whole truth, may rightly decide which story bears the impress of verity.' " (Italics added.)

Applying the above principles to the evidence presented by plaintiff, we feel that it was sufficient to support a verdict limiting the release to the specific items for which plaintiff sought reimbursement. If Safeco's conduct is "carefully scrutinized to discover whether the defendant has dealt fairly with the plaintiff" (*id.*, at p. 477), it is apparent that "the circumstances furnished the opportunity for overreaching" and there was substantial evidence that "the defendant or his agent took advantage of it, and . . . the plaintiff was thereby misled" (*id.*, at p. 476).

The most important fact is that Safeco and plaintiff were not dealing at arms length. She brought evidence of her out-of-pocket expense to Evans at his request. Their relationship started as that of insurer and insured, with Evans acting as plaintiff's adjuster, making claims in her behalf. Consistent with this relationship, she was given immediate payment of all interim expenses, including all medical outlay, car repairs and loss of wages claimed by her. This is not the kind of treatment one expects from the insurer of the opposing party in a personal injury claim situation. As a result of this courteous and helpful treatment, plaintiff came to place trust and confidence in Mr. Evans. As a natural result, she would not question what he gave her to sign in connection with her continued receipt of the "benefits" which had been so generously advanced.

However, in obtaining a general release in favor of Safeco's other insureds, the Sparrows, on May 10, 1971, Evans adopted an entirely contradictory posture toward plaintiff, one in which his position was adverse to her interests previously represented by him. According to plaintiff's testimony, there was no explanation of this change of posture since there was no discussion of any general release. Such a change in Evans' posture toward plaintiff called for a full explanation and warning to plaintiff that she was now obliged to look out for her own interest or find independent advice. Plaintiff's testimony was to the effect that she received neither. The circumstances above outlined, in our opinion, "furnished the opportunity for overreaching." (23 Cal.2d at p. 476.)

Other evidence would support a jury verdict that such overreaching in fact occurred. Plaintiff testified that she was rendered unconscious in the accident and did not recover until she found herself in the emergency hospital. At the time of the release, she was still suffering from the accident and required continued medical care, and she had not been able to return to work as of that date. ■ Although it is obvious that under such circumstances plaintiff had a substantial claim for general damages for her pain and suffering, she apparently settled for reimbursement of her special damages only. Unless it were shown that there was no substantial basis for liability on the part of the Sparrows, the settlement, like that obtained in *Jordan,* "was inadequate." ■ A jury might, therefore, conclude that there was such "overreaching" as to justify limiting the release to the specific items reimbursed on that date without the further necessity of any proof of affirmative misrepresentations or conduct designed to prevent plaintiff from reading the release. Thus, even if plaintiff signed exhibit A, the jury might properly render a verdict in her favor. On this ground, as well, the nonsuit was improperly granted.

The judgment is reversed and the cause is remanded for further proceedings consistent with the views above expressed.

Cobey, J., and Allport, J., concurred.