**Vicente L. MORTA; FHP, Inc., Plaintiffs–Appellees,**

v.

**KOREA INSURANCE CORP., Defendant–Appellant.**

No. 86–2643.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 14, 1987.

Decided Feb. 26, 1988.

1454

Thomas C. Sterling, Klemm, Blair, Sterling & Johnson, Agana, Guam, for defendant-appellant.

Peter F. Perez and Daniel R. Del Priore, Agana, Guam, for plaintiffs-appellees.

Before WIGGINS * and KOZINSKI, Circuit Judges, and GRAY,** District Judge.

KOZINSKI, Circuit Judge:

We consider whether, under Guam law, a release signed as part of a settlement of claims arising from an automobile accident bars recovery for after-discovered injuries.

---

* Judge Wiggins was drawn to replace Circuit Judge Anthony M. Kennedy.

** Honorable William P. Gray, Senior District Judge, Central District of California, sitting by designation.

**Facts**

On November 26, 1982, appellee Vicente Morta suffered a collision that damaged his 1976 Mazda station wagon and caused him bodily injury. According to Morta, the car was "a total loss." 1 Reporter's Transcript (RT) at 39. Morta himself was knocked unconscious and taken by ambulance to the emergency room at Guam Memorial Hospital. After treating Morta, the attending physician assured him that he was fine and could go home. Afterwards, Morta continued to have pain in his muscles, chin and chest. He was treated three days later by a second physician at the Seventh Day Adventist Clinic, who also told him he was fine and the pain would eventually subside.

Morta sought compensation for his losses from appellant Korea Insurance Corporation (KIC), which insured the driver who had caused the accident. Morta was directed to Bernabe Santa Maria, a claims adjuster. Morta and Santa Maria happened to be from the same area of the Philippines and conversed in their native tongues, Tagalog and Ilocano. Morta testified that he had no problem understanding Santa Maria.

Santa Maria helped Morta complete the claim form, received from Morta his medical reports, examined the damaged Mazda and, acknowledging the liability of his insured, offered Morta $900. Morta testified that the settlement offer had several components: "Three Hundred Dollars for my car; $250 from loss of compensation of work, like that; and Two Hundred some for sufferings and injury that I suffered, you know. So, they told me, included also the medical bill from SDA and the towing expenses, that item." 1 RT at 70–71; *id.* at 44.[1]

Morta was not satisfied with that amount, claiming that the car alone had a blue-book value of $2300.[2] Santa Maria told him that $900 was all he could pay. Morta did not jump at the offer; he thought it over and went to see a lawyer. He showed the lawyer the medical and police reports. The lawyer evaluated Morta's claim and advised him that he would be

---

1. Santa Maria testified that the settlement broke down into $500 for Morta's car and $400 for personal injuries.

2. He also admitted, however, that the 1976 Mazda station wagon was not in mint condition: "the body got some rusty spots which are in the hood." 1 RT at 77–78.

unlikely to recover much more than the $900 KIC had offered and that any attempt to do so would delay payment. Morta returned to Santa Maria's office and accepted the $900. Because the settlement check covered damages for the car as well as for personal injuries—in short, all of Morta's claims—Morta signed a standard release.

About a week after the settlement, Morta began to feel ill and dizzy. He was given medication by his doctor but soon thereafter he collapsed unconscious, awaking in a Honolulu hospital after undergoing emergency surgery for a blood clot in his brain. The medical bills amounted to approximately $11,000, all paid for by Morta's insurer, FHP, Inc.

Morta filed suit to recover damages resulting from this injury, disavowing the release on the ground that Santa Maria fraudulently misrepresented its contents. FHP intervened to recover from KIC for all medical expenses incurred in treating Morta's accident-related injuries. The parties stipulated to a separate trial on the validity of the release. After the evidence was presented, KIC moved unsuccessfully for a directed verdict. The jury returned a general verdict holding the release invalid, and the superior court entered judgment to that effect. The parties then stipulated, subject to KIC's right to appeal, to entry of judgment against KIC for $14,600, which, together with the $900 settlement, constituted the limits of the insurance policy.

The Appellate Division of the District Court for the District of Guam affirmed the judgment and KIC appealed to us under 48 U.S.C. § 1424–3(c) (Supp. III 1985).

### Contentions of the Parties

KIC argues that Morta signed the release with eyes open and for valuable consideration. By its terms, the release covers all claims arising out of the accident, whether known or unknown. In KIC's view, the release therefore conclusively

bars Morta's claim, and the superior court should have directed a verdict in KIC's favor.

Morta attacks the release on two grounds. First, he argues the release is subject to rescission because it was obtained by fraud, undue influence, mistake or deceit. Second, he argues that, even if the release is binding, it may not be invoked to bar recovery for injuries unknown and unanticipated at the time of execution. Morta argues that there was sufficient evidence for the jury to return a verdict in his favor on one or more of these theories and the superior court was therefore correct in refusing KIC's request for a directed verdict.

### Discussion

■ A directed verdict will be granted only if, examining the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, "there is no substantial evidence to support a verdict for that party." *Fabrica Inc. v. El Dorado Corp.*, 697 F.2d 890, 892 (9th Cir.1983); *see Peterson v. Kennedy*, 771 F.2d 1244, 1256 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986) (directed verdict proper where "the evidence permits only one reasonable conclusion as to the verdict"). We apply the same standard as the trial court in reviewing its decision. *Walker v. KFC Corp.*, 728 F.2d 1215, 1223 (9th Cir.1984); *Fabrica*, 697 F.2d at 892.

### I

■ The jury was properly instructed that the release could be set aside if induced by fraud, undue influence, mistake or deceit.[3] We therefore examine the record to see whether there is any substantial evidence to support rescission on any of these theories.[4]

■ A. *Fraud.* Morta's original complaint did not attack the release at all. He

---

3. Although the superior court gave a separate instruction on deceit, it was all but identical to the instruction on actual fraud. Moreover, there is no separate provision concerning deceit in the Guam Civil Code. We therefore consider deceit as merely a species of fraud.

4. Morta did not plead mistake in his complaint, even though mistake must be averred with particularity. *See* Guam R.Civ.P. 9(b) ("[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity"). Nor did he attempt to

amend his complaint to plead mistake. Furthermore, under Guam Civ. Code § 1691(2) (1970), Morta was obligated to tender return of the $900 consideration he received for signing the release as a prerequisite to rescission on any ground other than fraud. *See Graham v. Atchison, T. & S.F. Ry.*, 176 F.2d 819, 826 (9th Cir. 1949). The record is unclear about whether those procedural requirements were satisfied or waived. To conserve judicial resources, however, we assume they were satisfied and proceed to address these issues on the merits.

later amended the complaint to add two counts disavowing the release and alleging that KIC "falsely and fraudulently and with intent to deceive and defraud the plaintiff represented to plaintiff that the Release of All Claims form was not a complete settlement of damages plaintiff was requesting for injuries sustained in an auto accident." Excerpt of Record at 4; *see* Guam Civ. Code § 1572 (1970) (defining actual fraud). The proof at trial does not bear out this allegation.

The evidence presented to the jury consisted largely of testimony from Morta and Santa Maria, each giving his account of the negotiations between them. Those accounts do not differ all that much. Significantly, Morta did not testify that Santa Maria misrepresented the content or effect of the release in any way, only that Santa Maria never said anything about it at all. According to Morta, Santa Maria handed him the release, stating, "This is for your claim." 1 RT at 38. This statement, standing alone, certainly does not amount to fraud or anything close to it.

■ Morta argues, however, that Santa Maria committed fraud when he told Morta that $900 was "the only amount the insurance could give [him]." 1 RT at 70. Morta testified that when he asked, "Is that all I can get?," Santa Maria responded, "Well, I'm not the one who decide [sic] this. They decide it in there. I'm just working for them, so, I can't do nothing." *Id.* at 71. According to Morta, this "led [him] to believe that $900.00 was the only amount available to compensate him." Appellees' Brief at 12. This is not a reasonable construction of Santa Maria's statement, and the evidence conclusively establishes that Morta did not interpret it in this fashion. After reviewing the offer, Morta consulted a lawyer about the possibility of recovering more. The lawyer advised him that he could in fact get more—perhaps $1500—but cautioned that it would take time. Santa Maria's representation that he could pay no more—the type of statement frequently made by parties during negotiations—simply does not amount to fraud. Neither does anything else presented at trial. We therefore are unable to find any support for the jury's verdict on a theory of actual fraud.

■ The jury was also instructed on constructive fraud, which consists of *"any breach of duty* which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him." Guam Civ. Code § 1573(1) (1970) (emphasis added). As the language of the statute suggests, a finding of constructive fraud requires a confidential or trust relationship. *Guthrie v. Times–Mirror Co.*, 51 Cal.App.3d 879, 889, 124 Cal.Rptr. 577, 584 (1975).[5] KIC had no duty to Morta, however: As Morta was well aware, KIC was not his insurer, but that of an adverse party, the driver who caused the accident. Santa Maria and Morta dealt openly and at arm's length. There was no basis for a finding of constructive fraud. *See Sanger v. Yellow Cab Co.*, 486 S.W.2d 477, 481 (Mo.1972) ("[t]he releasee does not stand in a fiduciary relation to the releasor").

■ B. *Undue influence.* Under Guam law, undue influence may be established under any of the following circumstances: (1) "the use, by one in whom a confidence is reposed by another, ... of such confidence ... for the purpose of obtaining an unfair advantage over him"; or (2) "taking an unfair advantage of another's weakness of mind"; or (3) "taking a grossly oppressive and unfair advantage of another's necessities or distress." Guam Civ. Code § 1575 (1970). We find no evidence that Morta signed the release as a result of any of these circumstances.

Morta points to nothing in the record suggesting that he reposed any confidence in Santa Maria. To the contrary, all the available evidence suggests that Morta and Santa Maria negotiated at arm's length. Morta did not rely on Santa Maria to take care of him: He carefully checked the blue-book value of his car, obtained treatment from two physicians of his own choosing and consulted a lawyer. He complained to Santa Maria about the amount of the offered settlement and tried to get him to pay more. On the basis of the lawyer's advice, Morta finally decided to take the money offered to him and be done with the business.

---

**5.** Section 1573, like most of the Guam Codes, was borrowed from the California Codes, and we consider California decisions in construing identical provisions of Guam law. *See, e.g., Smith v. Lujan,* 588 F.2d 1304, 1306 (9th Cir. 1979).

*DuBois v. Sparrow,* 92 Cal.App.3d 290, 154 Cal.Rptr. 717 (1979), cited below, is not on point. There, the insurance agent and plaintiff "were not dealing at arms length"; the agent at first represented the plaintiff but then, without telling her, switched to an adversarial position, which "'furnished the opportunity for overreaching.'" *Id.* at 300, 154 Cal.Rptr. at 723 (citation omitted). Morta and Santa Maria always maintained a purely adversarial relationship. Morta did not testify otherwise.

Nor is there any evidence that Morta suffered from mental weakness of which Santa Maria could have taken advantage. Morta was not incapacitated by his injury; he was neither hospitalized, drugged, in serious pain nor otherwise prevented from bargaining effectively.[6] Morta testified that he did not begin to suffer from headaches and dizziness until several days after he received the settlement check. Indeed, the unknown, and unknowable, nature of Morta's latent symptoms forms the basis of his alternative argument. *See* p. 1458 *infra.*

Finally, nothing in the record suggests that Santa Maria knew or suspected Morta had any continuing vulnerability, or that Santa Maria did anything to take advantage of the situation. There was no reason for Santa Maria to believe Morta was in dire straits; Morta was not hospitalized, he was working and did not disclose any particularly pressing need for the settlement money. Like anyone else involved in an accident, Morta was anxious to get the unpleasant business behind him, advising Santa Maria that "'I'm getting tired of borrowing my daughter's car.'" 1 RT at 41; *see id.* at 77. That hardly amounts to the type of pressing need that would provide a basis for a claim of undue influence

or overreaching. *See Sanger,* 486 S.W.2d at 478 (upholding release as to unknown injuries where plaintiff quickly settled, being "anxious to get his car fixed because he was going on vacation in two weeks").

In any event, Santa Maria did nothing to pressure Morta into accepting the settlement in full or in part. Santa Maria did not intimate that the settlement would be withdrawn if not accepted on the spot, or that settlement on the car would be held hostage to a release of the personal injury claim; nor did Santa Maria delay making an offer in order to push Morta to the wall, or refuse a request for an advance payment or a rental car; nor was the offer shockingly low in light of what the parties knew at the time. No reasonable jury fairly applying the law could reach a verdict of invalidity on the basis of undue influence.

**C.** *Mistake.* The jury was instructed that it could set aside the release if it found that Morta's consent was vitiated by mistake. Under Guam law, "[m]istake of fact is a mistake, *not caused by the neglect of a legal duty on the part of the person making the mistake,* and consisting in ... [a]n unconscious ignorance or forgetfulness of a fact past or present, material to the contract." Guam Civ. Code § 1577(1) (1970) (emphasis added).

■ Morta alleges that he did not read the release and was mistaken about its contents. That mistake is inadequate to justify rescinding the release, however, because it was "caused by the neglect of a legal duty on the part of the person making the mistake." Morta spoke English; he was able to identify and read the release on the witness stand. Had he bothered to read the release before signing it, he would

---

6. *Cf. Backus v. Sessions,* 17 Cal.2d 380, 384, 110 P.2d 51, 53 (1941) (plaintiff still hospitalized in drugged, semiconscious state); *Wetzstein v. Thomasson,* 34 Cal.App.2d 554, 558–59, 93 P.2d 1028, 1030–31 (1939) (adjuster repeatedly visited plaintiff at her bedside for hours despite her stated wish not to discuss settlement); *Weger v. Rocha,* 138 Cal.App. 109, 114–15, 32 P.2d 417, 420 (1934) (plaintiff was "confined in a cast flat on her back, in a highly nervous and hysterical condition, suffering much pain, ... importuned and importuned by the agent"); *Raynale v. Yellow Cab Co.,* 115 Cal.App. 90, 92, 300 P. 991, 991 (1931) (defendants discussed minor property damage with plaintiff while she was still dazed and "in such agony that she could not and did not read the paper she signed," and then, "without explaining its effect, plac[ed] before her a release covering matters not discussed").

no doubt have understood its meaning and purpose.[7] Under established law, Morta may not rely on his failure to read the release as a basis for disavowing it, "particularly where he is given an opportunity to have it read and explained to him by some competent and reliable person," such as an attorney. 66 Am.Jur.2d *Release* § 15, at 690 (1973); *see, e.g., Casey v. Proctor,* 59 Cal.2d 97, 105, 378 P.2d 579, 583, 28 Cal.Rptr. 307, 311 (1963); *Izzy v. Mesquite Country Club,* 186 Cal.App.3d 1309, 1319, 231 Cal.Rptr. 315, 319 (1986); *accord Dobler v. Story,* 268 F.2d 274, 277 (9th Cir. 1959) (applying California law); *Sanger,* 486 S.W.2d at 481 (upholding release even though plaintiff "thought he was signing a receipt").

> [A] person who, without coercion or undue persuasion, executes a solemn release cannot subsequently impeach it on the ground of his own carelessness, if at the time of its execution he might have advised himself fully as to the nature and legal effect of the act done. *He cannot then complain that an imposition has been practiced upon him, and if he knows or by inquiry might know the exact nature of the act done, cannot subsequently invoke his own heedlessness to impeach his release by calling such heedlessness someone else's fraud.* He has no right to act as one who understands what he is doing, unless he intends to lead those with whom he is

dealing to believe that he understands the act done.

66 Am.Jur.2d at 691 (emphasis added).

In short, nothing on this record supports rescission of the settlement agreement and release under the theories presented to the jury.[8]

## II

█ Alternatively, Morta argues that the release is not binding as to injuries unknown and unforeseen at the time of its execution. He cites Guam Civ. Code § 1542 (1970), which provides that "[a] general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor." The release Morta signed, however, is not a general release within the meaning of this section. Section 1542 provides only that a document generally releasing all claims, but not referring to unknown claims, does not discharge such claims. A release expressly compromising unknown claims growing out of a particular accident is valid and enforceable according to its terms. *Berry v. Struble,* 20 Cal.App.2d 299, 302–03, 66 P.2d 746, 747 (1937) (construing Cal.Civ.Code § 1542, which is identical to the Guam statute); *Kostick v. Swain,* 116 Cal.App.2d 187, 194, 253 P.2d 531, 536 (1953) ("[i]t appears to be the rule that where the parties ... expressly and intentionally settle

---

7. There is nothing ambiguous, unclear or tricky about the release. It is less than a page long. At the top, in characters a quarter-inch tall, is the word "RELEASE"; immediately beneath, in slightly smaller letters, are the words "OF ALL CLAIMS." A few concise sentences follow, clearly and unequivocally stating that Morta releases KIC from all claims "growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries and property damage" arising out of the accident in question. Morta also acknowledges that "the injuries sustained are or may be permanent and progressive and that recovery therefrom is uncertain and indefinite...." In capital letters near the bottom is a certification that the signer has read and understands the terms of the release; immediately above the signature line, also in capitals, is a "caution" instructing the signer to read the release before signing it.

8. The dissent suggests six factors that might lead a reasonable jury to conclude that Santa Maria's conduct was "objectionable enough to excuse the plaintiff from his failure to read and understand the release that he signed and the waiver that it contained." Dissent at 1461. With all due respect, "objectionable enough" is not a legal standard. Morta cannot avoid the release on the basis of general unease the jury might feel about the fairness of the settlement; there must be substantial evidence justifying rescission on one of the specific grounds provided by Guam law. The dissent does not analyze the six factors in terms of any particular legal theory, and with good reason: None of them, alone or in combination, amounts to fraud, undue influence or mistake.

for unknown injuries the release given by the claimant is incontestible"); *see Dingman v. J.E. French Co.*, 3 Cal.App.2d 512, 514–15, 39 P.2d 826, 827 (1935); *Suckow Borax Mines Consol., Inc. v. Borax Consol., Ltd.*, 185 F.2d 196, 206–07 (9th Cir. 1950) (applying California law), *cert. denied*, 340 U.S. 943, 71 S.Ct. 506, 95 L.Ed. 680 (1951); *Pacific Greyhound Lines v. Zane*, 160 F.2d 731, 736 (9th Cir.1947) (same); *accord Bernstein v. Kapneck*, 290 Md. 452, 461, 430 A.2d 602, 607 (1981); *Trevathan v. Tesseneer*, 519 S.W.2d 614, 615–16 (Ky.1975) (holding terms of release for unknown injuries in similar circumstances to be conclusive); *Sanger*, 486 S.W.2d at 480–82; *Emery v. Mackiewicz*, 429 Pa. 322, 326, 240 A.2d 68, 70 (1968). The release Morta signed expressly compromises claims for unknown injuries. *See* note 7 *supra*.

Morta cites *Casey v. Proctor*, 59 Cal.2d 97, 378 P.2d 579, 28 Cal.Rptr. 307 (1963), which overruled the *Berry* line of cases and held that unknown claims may be released only if there is evidence "apart from the words of the release" that the parties intended to cover such claims. *Id.* at 109, 378 P.2d at 586, 28 Cal.Rptr. at 314. Morta contends that there was no extrinsic evidence in this case supporting the words of the release.

██ While *Casey* is now the law of California, it is not necessarily the law of Guam. The Guam Codes were originally promulgated by the Naval Government of Guam on December 28, 1933; they were later codified and enacted by the first territorial legislature in 1953. Because the Guam Codes were derived from the California Codes, we have held that California decisions predating the enactment of the Codes are "controlling authority on issues of the statutory construction and effect of Guam laws." *Roberto v. Aguon*, 519 F.2d 754, 755 (9th Cir.1975) (citing *United States v. Johnson*, 181 F.2d 577, 580 (9th Cir.1950)). California cases decided after the adoption of the Guam Codes are merely persuasive. *Id.* (citing *Tabor v. Ulloa*, 323 F.2d 823, 824 n. 5 (9th Cir.1963)).

It is unclear whether, under *Roberto*, the decision in *Berry* is controlling or merely persuasive. *Roberto* seemed to consider the adoption of the Codes in 1933 as the pivotal date, although its rationale seems to apply equally to the enactment of the Codes by the Guam territorial legislature in 1953. *Berry* was decided in 1937, less than four years after the original adoption of the Guam Codes, and appears to follow prior case law in construing section 1542. *See Dingman*, 3 Cal.App.2d at 514–15, 39 P.2d at 827. It clearly represented the law of California when the Guam legislature enacted the Civil Code. *See Kostick*, 116 Cal.App.2d at 194, 253 P.2d at 536 (1953). If not controlling, *Berry* is certainly highly instructive on the proper interpretation of section 1542. *Casey*, having been decided ten years after Guam readopted the Codes in 1953, holds considerably less sway.

██ In any event, we believe that, by relying on the agreement of the parties rather than extrinsic evidence, *Berry* provides the far better rule of law. Written instruments, fixing the parties' rights and responsibilities by mutual consent, bring an important measure of order to life and greatly facilitate the adjudicatory process. While interpreting contract language is not always easy, sticking to the words the parties actually used limits substantially the bounds of legitimate disagreement. This objective rule thus "favors the orderly settlement of disputes and avoids multiplicity of suits and the chaos which would result if the releases were not treated seriously by the courts." *Trevathan*, 519 S.W.2d at 616; *accord Emery*, 429 Pa. at 326, 240 A.2d at 70.

*Casey*, by contrast, adopts a parol evidence rule stood on its head: Extrinsic evidence not only is permitted to explain or amplify the words of a written instrument, it is required. *See Larsen v. Johannes*, 7 Cal.App.3d 491, 506, 86 Cal.Rptr. 744, 752 (1970). This approach is antithetical to the objective theory of contract law, a theory that binds the parties to the reasonably objective meaning of the words they use, not some secret reservation or misperception they may harbor. As the Maryland

Court of Appeals noted, the approach adopted by *Casey* "often overlooks or avoids the words used by the parties to express their agreement and in its place substitutes undefined conjecture as to what the releasor would have intended if the full extent of the injuries had been known at the time of the compact." *Bernstein*, 290 Md. at 461, 430 A.2d at 607. But it is exceedingly difficulty to know what parties *really* thought many years back and virtually impossible to divine what they *would* have thought had they but known something they did not. The *Casey* approach therefore supplants "the otherwise settled rules of construction which, for the most part, have operated satisfactorily for centuries," with a fact-based rule that encourages sloppiness and evasion, and promotes litigation and delay in the settlement of claims. *Id.; see Sanger*, 486 S.W.2d at 481 (quoting *Sosa v. Velvet Dairy Stores, Inc.*, 407 S.W.2d 615, 621–22 (Mo.App.1966)).

Importantly, *Casey* precludes summary judgment in cases involving written releases. Interpreting the language of a written instrument is normally a question of law for the court to decide; claims regarding secret intentions or reservations raise issues of fact that must be put before a jury. Under *Casey*, a plaintiff may raise an issue of fact simply by claiming that he did not know, or did not think, or was not told, or did not understand what he was doing, regardless of any contrary representations in the written instrument. *Casey* thus short-circuits the binding force of written agreements by giving juries the power to nullify them.

■ At root, this case is about the respect the law ought to accord agreements between private parties. Despite recent cynicism, sanctity of contract remains an important civilizing concept. *See, e.g.*, C. Fried, *Contract as Promise* 1, 132 (1981) ("[t]hese are indeed the laws of freedom"). It embodies some very important ideas about the nature of human existence and about personal rights and responsibilities: that people have the right, within the scope of what is lawful, to fix their legal relationships by private agreement; that the future is inherently unknowable and that individuals have different visions of what it may bring; that people find it useful to resolve uncertainty by "mak[ing] their own agreement and thus designat[ing] the extent of the peace being purchased," *Bernstein*, 290 Md. at 459, 430 A.2d at 606; that courts will respect the agreements people reach and resolve disputes thereunder according to objective principles that do not favor one class of litigant over another; and that enforcement of these agreements will not be held hostage to delay, uncertainty, the cost of litigation or the generosity of juries. As Professor Fried notes,

> [t]he regime of contract law, which respects the dispositions individuals make of their rights, carries to its natural conclusion the liberal premise that individuals have rights. And the will theory of contract, which sees contractual obligations as essentially self-imposed, is a fair implication of liberal individualism.

C. Fried, *Contract as Promise* 2 (footnotes omitted).

But "the general rule of freedom of contract includes the freedom to make a bad bargain." *Sanger*, 486 S.W.2d at 482. "If we take autonomy seriously as a principle for ordering human affairs, ... people must abide by the consequences of their choices...." C. Fried, *Contract as Promise* 113. It is a fundamental principle of contract law, therefore, that "[w]ise or not, a deal is a deal." *United Food & Commercial Workers Union v. Lucky Stores, Inc.*, 806 F.2d 1385, 1386 (9th Cir.1986).

Morta's latent injury makes this a hard case factually but not legally. Parties can never be sure about what the future will bring; they sign contracts for the very purpose of guarding against unforeseen contingencies. Morta freely entered into a settlement that specifically released unknown claims for latent or progressive personal injuries. There being no cause either in fact or law for invalidating the release, the superior court erred in failing to direct a verdict upholding it.

### Conclusion

The judgment of the district court is REVERSED, and the case is REMANDED

to the superior court for entry of a directed verdict in favor of KIC.

GRAY, District Judge, dissenting:

In *Chase Manhattan Bank v. Gems-By-Gordon, Inc.*, 649 F.2d 710, 712 (9th Cir. 1981), this court said:

> "We will generally defer to interpretations of Guam law adopted by the United States District Court for the District of Guam, Appellate Division. Determinations of Guam law by that court will be affirmed on appeal if they are based upon a tenable theory and are not manifestly erroneous."

No adherence to such a statement of policy can be discerned in the majority opinion, and I accordingly register my respectful dissent.

In the first place, the issues presented in this litigation were basically factual. The majority believes that the evidence presented did not justify the recovery awarded to the plaintiff, and the "Discussion" section of the opinion contains a superb analysis of the facts from the standpoint of the defendant. However, the trial court, in its denial of a defense summary judgment motion, the jury, in its verdict, and the United States District Court for the District of Guam, in its opinion of affirmance, all concluded that there was "another side to the coin" and that the evidence justified a judgment in favor of the plaintiff.

Based upon my own examination of the record, I am convinced that a reasonable jury could have concluded that:

(a) Morta's comparatively limited education was a disadvantage to him in his dealings with the much more sophisticated and experienced Santa Maria, and that the latter took undue advantage of this circumstance.

(b) The recent nature of Morta's personal injuries and the serious illness that they later and suddenly precipitated may have been indicative of a reduced physical condition and competence at the time the release was signed.

(c) Santa Maria knew that Morta was in immediate need of settlement money and was in no position to challenge whatever proposal that KIC might offer.

(d) Santa Maria did not encourage Morta to read the proposed release or otherwise cause him to understand that it provided for a waiver of liability for any injuries that might later develop from the accident.

(e) When Morta went to an attorney, he had not read the proposed release, nor had he obtained a copy from Santa Maria. The conversation with the attorney did not in any manner alert Morta to the consequences of a release.

(f) When Morta returned to Santa Maria's office, he signed the four papers that were put before him, including the release, without having read them, in order that he might get his much needed $900, and without any awareness of the extent of the release.

Under such circumstances, I believe that a reasonable jury readily could have concluded that Santa Maria's conduct was objectionable enough to excuse the plaintiff from his failure to read and understand the release that he signed and the waiver that it contained.

There is a further reason why I believe that the decision below must be affirmed. Section 1542 of the Civil Code of Guam (which is quoted at page 1458 of the majority opinion) was taken word for word from Section 1542 of the California Civil Code. In the California Supreme Court case of *Casey v. Proctor*, 59 Cal.2d 97, 109, 28 Cal.Rptr. 307, 314, 378 P.2d 579, 586 (1963), Justice Peters, in writing the carefully reasoned opinion of the court, ruled that:

> "It therefore appears beyond reasonable doubt that Civil Code, section 1542 was intended by its drafters to preclude the application of a release to unknown claims in the absence of a showing, *apart from the words of the release* of an intent to include such claims.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> This interpretation of section 1542 does not prevent all settlements for unknown claims.... Rather, its purpose was to prevent the mere recital in the release to that effect from barring a claim for inju-

ries later discovered in the absence of a showing of a conscious understanding that if injuries were suffered which had not yet manifested themselves, they too would be discharged by the release." (Emphasis supplied.)

In the present case, there is no evidence whatever, "apart from the words of the release", that would indicate that Morta knowingly intended to give up his right to recover for unknown claims. Thus, under the rule in *Casey,* his failure to have insisted upon reading the release and understanding its implications did not *ipso facto* prevent such recovery. As the majority opinion points out, the *Casey* decision specifically overruled *Berry v. Struble,* 20 Cal. App.2d 299, 66 P.2d 746 (1st Dist.1937) and the line of cases that followed it, which had ruled that, in the absence of fraud or duress, a release specifically waiving the right to pursue unknown claims is valid and enforceable.

My colleagues on this panel do not like the rule laid down by *Casey,* and the majority opinion sets forth at length the reasons for their belief that "by relying on the agreement of the parties rather than extrinsic evidence, *Berry* provides the far better rule of law." However, *Casey* is the law in California, is accordingly persuasive in Guam, *Roberto v. Aguon,* 519 F.2d 754 (9th Cir.1975), and was cited in this case by the United States District Court for the District of Guam in the opinion affirming the decision of the trial court. It therefore seems to me that our philosophical views concerning the wisdom or lack of wisdom in the doctrine that it announced are of little importance. Certainly, the decision below "[is] based upon a tenable theory and [is] not manifestly erroneous." *See Chase Manhattan Bank v. Gems-By-Gordon, Inc.,* 649 F.2d 710, 712 (9th Cir.1981).

Accordingly, I would affirm the decision of the United States District Court for the District of Guam.